**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ADAOBI STELLA UDEOZOR, a/k/a
Adaobi Stella Obioha, a/k/a Stella
Udeozor, a/k/a Adaobi Stella
Obiaha,
          *Defendant-Appellant.*

No. 06-4467

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Peter J. Messitte, District Judge.
(8:03-cr-00470-PJM)

Argued: December 7, 2007

Decided: February 1, 2008

Before WILKINSON and SHEDD, Circuit Judges,
and John Preston BAILEY, United States District Judge
for the Northern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Shedd and Judge Bailey joined.

## COUNSEL

**ARGUED:** Victoria Toensing, DIGENOVA & TOENSING, L.L.P.,
Washington, D.C., for Appellant. Dirk Christian Phillips, UNITED

STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Brady Toensing, Joseph E. diGenova, DIGENOVA & TOENSING, L.L.P., Washington, D.C., for Appellant. Wan J. Kim, Assistant Attorney General, Jessica Dunsay Silver, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

We are asked to review the rulings of the district court in the trial and sentencing of Dr. Adaobi Stella Udeozor for conspiracy to hold another in involuntary servitude and for harboring a juvenile alien. Dr. Udeozor makes numerous claims regarding her conviction and sentence. Her three principal claims are as follows: one, the district court abused its discretion by admitting evidence of sexual abuse of the victim by Dr. Udeozor's former husband and co-conspirator; two, the district court improperly admitted recorded telephone conversations between Dr. Udeozor's co-conspirator and the victim; and three, the district court abused its discretion by including a special findings form on the second page of the general verdict form used to determine Dr. Udeozor's guilt or innocence. We find that these claims lack merit, and we affirm the defendant's conviction and sentence.

I.

On November 18, 2004, a jury convicted Dr. Udeozor on two counts. First, the jury convicted her of violating 18 U.S.C. § 371 (2000), which criminalizes conspiracy "to commit any offense against the United States," here, specifically, the knowing and willful holding of another in a condition of involuntary servitude. *See* 18 U.S.C. § 1584 (2000). Second, the jury convicted Dr. Udeozor of violating 8 U.S.C. § 1324(a)(1)(A)(iii) and (B)(i), which criminalize the harboring of an alien "for the purpose of commercial advantage or private financial gain."

The facts underlying Dr. Udeozor's convictions are as follows. In 1996, Dr. Udeozor's husband, George Udeozor ("Mr. Udeozor"),

induced a fourteen-year-old girl ("the victim") to leave her home country of Nigeria and to enter the United States. Mr. Udeozor promised the victim and her family that she could attend school in the United States, and that he would send payment to the victim's parents for her help in caring for the Udeozors' children. In October 1996, Mr. Udeozor brought the girl into the United States using his eldest daughter's passport.

The victim lived with the Udeozors from October 1996 until October 2001. During that time, the Udeozors required her to care for their children, to clean their house, and to cook for them. The victim testified at trial that she was also required to work in Dr. Udeozor's medical office, where she performed multiple tasks, including answering the phones, preparing patient charts, verifying patients' insurance information, and cleaning out medical examination rooms. The victim received no compensation for her work. The victim's father testified that he received only "[o]ne piece of cloth and a bag of rice." The Udeozors never enrolled the victim in any school.

During this time, the Udeozors subjected the victim to repeated physical, emotional, and sexual abuse. In particular, at trial, the victim testified that Dr. Udeozor hit her with an "open hand, and sometimes her fist, and then sometimes she would use her shoe." She also testified that Dr. Udeozor threw things at her, and that Dr. Udeozor "would twist and pull [her] ear." During one particular beating, the Udeozors forced the young girl to kneel and raise her hands above her head, after which Dr. Udeozor beat her in her sides with a flexible wooden cane, and Mr. Udeozor struck her in the hand with the metal part of a belt. After the beating, Dr. Udeozor forced the victim to continue kneeling for an additional forty-five minutes. This beating left the victim with marks on her sides and breathing difficulties. During another beating, Dr. Udeozor struck the victim with a shoe, causing her wrist to be dislocated. The victim never received any medical attention after any of these beatings.

The Udeozors also emotionally abused the victim. The Udeozors threatened to send the victim back to Nigeria, and they told her that the government would deport her if she left the house because she did not have "papers." Finally, between 1997 and 1999, Mr. Udeozor forced the victim — on numerous occasions — to engage in sexual

intercourse with him, conduct which the government characterized in its argument at trial as "rape." The victim testified that Mr. Udeozor threatened to and did sexually assault her more frequently and more forcefully if his children misbehaved or suffered harm while in her care. Mr. Udeozor also warned the victim that if she spoke to anyone about the sexual assaults, he would tell her parents that she had become a prostitute.

While the Udeozors were at work and their children were at school, the victim — who taught herself to use the computer — conducted research on immigration and made contacts with non-profit groups about her situation. One of the victim's contacts suggested that she write a letter to Dr. Udeozor about her plight, which she did. The victim gave the letter to Dr. Udeozor on October 30, 2001, and a confrontation ensued. The victim subsequently called the police and ran to a neighbor's house. Once the police arrived, the victim left the Udeozors' home.

After the jury convicted Dr. Udeozor, on April 18, 2006, the district court sentenced her to 87 months' imprisonment and ordered her to pay the victim $110,249.60 in restitution.

Dr. Udeozor raises various claims on appeal. She contends that the district court abused its discretion by admitting evidence of sexual abuse by Mr. Udeozor. She argues that the district court improperly admitted recorded telephone conversations between Mr. Udeozor and the victim. She further contends that the district court abused its discretion and tainted the jury verdict by including a special findings form on the second page of the verdict form used to determine her guilt or innocence. We address these claims in turn.

II.

Dr. Udeozor first contends that the district court abused its discretion by admitting evidence that her former husband and co-conspirator Mr. Udeozor had engaged in sexual intercourse with the victim. Dr. Udeozor argues that this evidence should have been excluded under Fed. R. Evid. 403 because "its probative value [was] substantially outweighed by the danger of unfair prejudice." We define undue prejudice as "a genuine risk that the emotions of the jury

will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) (internal quotations omitted). According to Dr. Udeozor, she was not aware of her husband's conduct, and that his conduct did not further the conspiracy with which she was charged. Thus, Dr. Udeozor argues, the government infected her entire trial with inflammatory evidence of rape that was committed not by her, but by her husband.

It is not an easy thing to overturn a Rule 403 ruling on appeal. Rule 403 is a rule of inclusion, "generally favor[ing] admissibility . . . ." *United States v. Wells*, 163 F.3d 889, 896 (4th Cir. 1998). District judges enjoy wide discretion to determine what evidence is admissible under the Rule. *See United States v. Love*, 134 F.3d 595, 603 (4th Cir. 1998). We "review a district court's admission of evidence over a Rule 403 objection under a broadly deferential standard." *Id.* (internal quotations omitted). Indeed, "[a] district court's decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." *United States v. Williams*, 445 F.3d 724, 732 (4th Cir. 2006) (internal quotations omitted). This deference is well warranted: "[T]rial judges are much closer to the pulse of a trial than [appellate judges] can ever be and broad discretion is necessarily accorded them . . . ." *United States v. Tindle*, 808 F.2d 319, 327 n.6 (4th Cir. 1986) (internal quotations omitted). Thus, when reviewing a trial court's decision to admit evidence under Rule 403, "we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990).

Judged against these standards, the district court did not abuse its discretion in admitting the evidence of Mr. Udeozor's sexual abuse of the victim. This is because the probative value of the evidence of sexual abuse is not, as Dr. Udeozor contends, "substantially outweighed" by any unfairly prejudicial effect. While we have stated that "no evidence could be more inflammatory or more prejudicial than allegations of child molestation," the Rule 403 inquiry requires us to weigh its probative value against the danger of harm. *Ham*, 998 F.3d at 1252. Here, evidence of sexual abuse — even though committed

by Mr. Udeozor and not Dr. Udeozor — was probative of the conspiracy to impress the victim into involuntary servitude.[1]

Specifically, to make its case against Dr. Udeozor, the government had to establish, as set forth in the instructions given the jury, that Dr. Udeozor was part of a conspiracy to "compel" the victim "to work against her will, for the benefit of another person or persons, by the use of force, the threat of force, or the threat of legal coercion." Mr. Udeozor's sexual abuse of the victim was one of the forms of force used to keep the minor victim in the condition of involuntary servitude. Therefore, it was part and parcel of a conspiracy — involving nearly four years of physical, psychological, and sexual abuse — to exercise complete control over the young girl in the Udeozors' household.

In fact, this court has already held that abuse by a defendant's co-conspirator can constitute a means of furthering a conspiracy to obtain free labor from a victim. In *United States v. Bonetti*, we held that one spouse's physical abuse of an illegally harbored alien was "committed in furtherance" of the couple's conspiracy to obtain free labor, because such abuse intimidated the victim "from asserting her right to payment or resisting [the couple's] demands that she work." 277 F.3d 441, 447 (4th Cir. 2002). There, as here, the jury was entitled to hear about the full scope of the conspiracy. Thus, it was not an abuse of discretion for the trial judge to allow the jury to hear evidence that sexual abuse was used to make the victim believe she had no choice but to comply with the Udeozors' demands.

---

[1]Dr. Udeozor relies heavily on this court's decision in *United States v. Ham*, in which we held that the probative value of evidence that the defendants' religious sect engaged in child molestation was so outweighed by its prejudicial effect that it should have been excluded. 998 F.2d at 1253-54. *Ham*, however, is distinguishable from this case. In *Ham*, the inflammatory evidence had very little probative value: It was relevant only as indirect proof of motive for murder, and it merely would have made the motive "slightly more likely." *Id.* at 1253. Here, Mr. Udeozor's sexual brutality was a vital component of the Udeozors' campaign of abuse to keep the victim within their control, and thus is both directly relevant to and intertwined with the charged offense of conspiracy.

Accordingly, the district court did not exceed the boundaries of permissible judgment in regarding the evidence of sexual brutality as a matter of weight rather than admissibility. The jury had a choice whether and to what extent to credit the evidence of sexual abuse, and insofar as Dr. Udeozor believed the jury should discount the evidence of Mr. Udeozor's sexual conduct, she could have argued as much. In fact, the government ran its own risks in introducing the evidence. Its strategy could quickly backfire if the jury were to conclude the government was attempting to pin on Dr. Udeozor actions in which she played no part and of which she was totally unaware. It was wholly open to Dr. Udeozor to attack the evidence on just this ground, by arguing, as she does here, that she had no knowledge of, much less involvement in, Mr. Udeozor's sexual abuse of the victim.[2]

As the district court pointed out, Dr. Udeozor could also have argued that her husband's sexual conduct had nothing to do with the conspiracy at all. But given that the evidence of Mr. Udeozor's acts was not so removed from Dr. Udeozor's wrongdoing and not so removed from the count of conspiracy, it was not an abuse of discretion for the district court to conclude that the evidence was not so prejudicial as to be inadmissible under Rule 403.

Moreover, to rule this evidence inadmissible outright would create problems of its own. Sexual coercion and subordination have been among the worst indicia of involuntary servitude. To reverse the trial court's admission of such evidence here would draw us closer to an inadvisable rule of per se inadmissibility with respect to a badge and incident of servitude which is distressingly common, not just histori-

---

[2]Whether and to what extent Dr. Udeozor had knowledge of Mr. Udeozor's acts of sexual abuse is a matter of some dispute. While Dr. Udeozor claims that she was completely unaware of her husband's conduct, the government contests the point. The government cites the testimony of Dr. Udeozor's former driver, who stated that "one day [Dr. Udeozor] said in the car that she suspected [that Mr. Udeozor was having sex with the victim]." In any event, whether Dr. Udeozor was aware of the sexual abuse is not dispositive, because "[a] conspirator need not have had actual knowledge of the co-conspirators or of the details of the conspiracy" for a conviction of conspiracy to be sustained. *United States v. Morsley*, 64 F.3d 907, 919 (4th Cir. 1995).

cally, but for young women who find themselves in coercive circumstances today. The Udeozors' scheme involved an allegedly noxious brew of physical, psychological, and sexual coercion of its minor victim, and the trial court did not exceed its discretion in viewing the challenged evidence as relevant to the basic theory of the government's conspiracy count.

## III.

Dr. Udeozor next contends that two telephone conversations between the victim and Mr. Udeozor, which the police recorded, were improperly admitted into evidence. In the challenged conversations, Mr. Udeozor stated that he had brought the victim into the United States illegally, but he denied having forcible sexual relations with the victim. In addition, Mr. Udeozor stated that he was "concerned for [his] own self," and that he needed to get an attorney. He also asked the victim what she had told the police so that he could ensure his story matched hers; whether she had told the police she had been beaten; and whether the police were looking for him. Mr. Udeozor told the victim to keep everything they had discussed between the two of them.

Dr. Udeozor's challenge to the admission of her former husband's statements stems from the fact that Mr. Udeozor was unavailable to testify at her trial. Around 1998, Mr. Udeozor left his wife and family. His children testified that the last time they saw him was "around Christmastime" of 1998. Mr. Udeozor since fled the United States, and attempts to extradite him have proven unsuccessful. Accordingly, Dr. Udeozor makes two arguments about Mr. Udeozor's statements on the tapes. One, she argues that the two taped telephone conversations were inadmissible hearsay. Two, she contends that admission of the two taped telephone conversations violated her Sixth Amendment right to confront Mr. Udeozor, her absent co-conspirator.

## A.

We take up the hearsay argument first. Federal Rule of Evidence 802, the hearsay rule, "is premised on the theory that out-of-court statements are subject to particular hazards," including dangers of insincerity, ambiguity, erroneous perception, and faulty memory. *Wil-*

*liamson v. United States*, 512 U.S. 594, 598 (1994). The Federal Rules of Evidence, however, except certain kinds of out-of-court statements — statements which are less susceptible to the dangers of hearsay — from the general rule that hearsay is inadmissible. *Id.* Rule 804(b)(3) makes one such exception for statements made against the declarant's interest: statements which, when they were made, "so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement[s] unless believing [them] to be true." Fed. R. Evid. 804(b)(3).

The district court overruled Dr. Udeozor's hearsay objection on this ground, but she contends that the recorded statements made by her husband were not entirely inculpatory, and thus do not fall within the exception set forth in Rule 804(b)(3). Specifically, in his statements to the victim recorded on these tapes, Mr. Udeozor suggested that their sexual relationship was consensual. Therefore, Dr. Udeozor argues, Mr. Udeozor's statements were not inculpatory as to his use of force against the victim, the purpose for which the government sought their admission. Rule 804(b)(3), however, is not so circumscribed. Whether Mr. Udeozor's statements were "self-inculpatory or not can only be determined by viewing [the statements] in context." *Williamson*, 512 U.S. at 603.

Viewed in context, many statements, even those that do not amount to an admission of a crime or an element of a crime, constitute statements "against penal interest" for purposes of Rule 804(b)(3). For example, "statements that are on their face neutral," "statements that give the police significant details about [a] crime," and statements that a reasonable person in the declarant's position would realize implicate him in a conspiracy, all may be self-inculpatory for purposes of Rule 804(b)(3). *Id.*

Viewing Mr. Udeozor's statements in context demonstrates that they were "sufficiently against [Mr. Udoeozor's] penal interest that a reasonable person in [his] position would not have made the statement[s] unless believing [them] to be true." *Id.* at 603-04. Mr. Udeozor made multiple statements that were against his penal interest, and not just as to force. Mr. Udeozor admitted to smuggling the victim into the United States illegally. He admitted to hitting the victim, and

he asked her whether she had told the police she had been beaten. He repeatedly asked the victim whether the police were looking for him, and he demanded that she tell him everything that she had told the police. And although Mr. Udeozor denied having forcible intercourse with the victim, he clearly admitted to engaging in sexual intercourse with a minor — an act the district court recognized could be seen as "an act of intimidation." To say that admission of such acts is in some sense "exculpatory" belies the nature of the word. The district court did not abuse its discretion in admitting the taped conversations into evidence under Rule 804(b)(3).

## B.

Dr. Udeozor also argues that the taped conversations between her husband and the victim were admitted in violation of Dr. Udeozor's Sixth Amendment right "to be confronted with the witnesses against [her]." *U.S. Const.* amend. VI. The Supreme Court has interpreted the Confrontation Clause of the Sixth Amendment as barring "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). As *Crawford* and later Supreme Court cases make clear, a statement must be "testimonial" to be excludable under the Confrontation Clause. *See Davis v. Washington*, 126 S.Ct. 2266, 2273 (2006). This limitation is grounded in the text and history of the Sixth Amendment, which "applies to 'witnesses' against the accused — in other words, those who 'bear testimony.'" *Crawford*, 541 U.S. at 51.

While the Supreme Court has yet to spell out a comprehensive definition of the term "testimonial," it has provided guidance as to its meaning. To begin, in *Crawford*, the Court set forth three formulations of the "core class of 'testimonial' statements": One, "*ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; two, "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and three, "statements that were made under circumstances

which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52 (citations and quotations omitted).

As the Court in *Crawford* pointed out, these three formulations of the "core class" of testimonial statements share a "common nucleus." *Id.* at 52. All three of these formulations indicate, twice explicitly, that the "common nucleus" of the "core class" of testimonial statements is whether a reasonable person in the declarant's position would have expected his statements to be used at trial — that is, whether the declarant would have expected or intended to "bear witness" against another in a later proceeding. Indeed, this court and other circuits have recognized that *Crawford* stands for this principle. *See, e.g.*, *United States v. Jordan*, ___ F.3d ___, 2007 WL 4234735, *8 (4th Cir. Dec. 4, 2007) ("The critical *Crawford* issue here is whether [the declarant], at the time she made her statements . . . reasonably believed these statements would be later used at trial."); *United States v. Maher*, 454 F.3d 13, 21 (1st Cir. 2006) (same); *United States v. Ellis*, 460 F.3d 920, 926 (7th Cir. 2006) (An essential aspect of a testimonial statement is that the declarant would "reasonably expect[ ] the statement to be used prosecutorially"); *United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) ("[T]he 'common nucleus' present in the formulations which the Court considered centers on the reasonable expectations of the declarant."); *United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005) (same); *United States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004) (same).

Two years later, in *Davis v. Washington*, the Supreme Court applied *Crawford*'s teachings to determine whether certain statements made in response to police interrogations were testimonial. *Davis*, 126 S.Ct. at 2273-74. *Davis*' application of *Crawford* is entirely consistent with the notion that the "common nucleus" of testimonial statements is the declarant's expectations. In *Davis*, the statements barred by the Confrontation Clause were those written by a victim in an affidavit, in a room where she was separated from the defendant, and given to a police officer for his investigation of an alleged crime of domestic violence. Those not excluded were statements made by an individual during a 911 call in a plain attempt to request help. *Id.* at 2278. The distinction between the two sets of statements in *Davis* is consistent with the principle that, for a statement to be testimonial, the

declarant must have had a reasonable expectation that his statements would be used prosecutorially: "No 'witness' goes into court to proclaim an emergency and seek help." *Id.* at 2277.

C.

Mr. Udeozor's recorded statements are not "testimonial" for purposes of the Confrontation Clause. This is true for several reasons. First, Mr. Udeozor's statements on the tapes do not fall within any of the explicit examples of testimonial statements set forth in *Crawford* or *Davis*. His statements were made not as part of prior testimony at a preliminary hearing, before a grand jury, or at a former trial, nor were they made during a police interrogation. Neither were Mr. Udeozor's statements, as in *Davis*, taken by police at the scene of a crime in the absence of an ongoing emergency.

Second, Mr. Udeozor's statements are not testimonial because, objectively viewed, no reasonable person in Mr. Udeozor's position would have expected his statements to be used later at trial. Mr. Udeozor certainly did not expect that his statements would be used prosecutorially; in fact, he expected just the opposite. As discussed above, Mr. Udeozor made numerous statements to the victim that were contrary to his own penal interests, including admissions that he had hit the victim, had engaged in sexual intercourse with her, and had smuggled her into the United States illegally. Moreover, he made the victim promise that she would keep their conversation between the two of them. These statements would not have been made by a reasonable person who believed his statements would be used in a later criminal prosecution.

Dr. Udeozor contends, however, that the statements her husband made on the tapes were "testimonial" as defined by the Supreme Court in *Davis* and therefore excludable because "[t]here can be no doubt the government taped [Mr. Udeozor's] conversations for the purpose of trial evidence." *Brief of Appellant* at 35. In particular, Dr. Udeozor argues that the government "used [the victim], in lieu of an investigator, to ask questions or elicit responses to establish whether criminal conduct had occurred." The government's alleged involvement renders Mr. Udeozor's statements testimonial because, as Dr. Udeozor argues, the Court in *Davis* focused not on whether the wit-

ness expected that his statements would be used prosecutorially, but whether the government had such an expectation. *Reply Brief of Appellant* at 10.

As an initial matter, we note that Dr. Udoezor's position that the government was using the victim "in lieu of an investigator" is hardly self-evident. The victim testified that the police did not tell her what to say during these calls. She also testified that she was free to end the calls whenever she felt uncomfortable.

But even if, as Dr. Udeozor contends, the victim called Mr. Udeozor at the government's behest, her argument that the touchstone of the "testimonial" inquiry is the reasonable expectations of the government overlooks the limits of the text of the Confrontation Clause itself. The Sixth Amendment is not structured as a set of investigatory restraints upon government. Rather, it confers a set of critical trial and pre-trial rights. The conferral of any right, however, is bounded by the text and terms of the grant. *Crawford*'s conception of the right to confront one's accusers — broad and generous as it is — is not so untethered from the Sixth Amendment text that it would wholly disable an opposing party from presenting otherwise admissible, nontestimonial evidence. The intent of the police officers or investigators is relevant to the determination of whether a statement is "testimonial" only if it is first the case that a person in the position of the declarant reasonably would have expected that his statements would be used prosecutorially. *See Ellis*, 460 F.3d at 924-926 (holding that to be "testimonial," it is necessary — but sometimes not sufficient — for a statement to have been made by a declarant who reasonably expected "that it would be used for later prosecution").

That the Confrontation Clause's focus is relentlessly textual is reflected in the Supreme Court's decisions in *Crawford* and *Davis*. In both of those opinions, the Supreme Court cites its earlier decision in *Bourjaily v. United States*, 483 U.S. 171, 181-84 (1987), for the proposition that "statements made unwittingly to a Government informant" are "clearly nontestimonial" within the meaning of the Confrontation Clause. *Davis*, 126 S.Ct. at 2275. *Bourjaily* is highly pertinent here. Because Mr. Udeozor plainly did not think he was giving any sort of testimony when making his statements to the victim during the recorded telephone calls, the admission of these two taped

conversations into evidence did not violate Dr. Udeozor's rights under the Confrontation Clause. Under no plain meaning of the term may the declarant's statements in this case be called those of a "witness," much less a witness bearing testimony. Any other ruling would disregard substantial circuit law and the teachings of the Supreme Court itself.

IV.

Dr. Udeozor also contends that the district court abused its discretion and tainted the jury's verdict by following a "slip-shod method" of submitting special findings as the second portion of the same verdict form used to determine whether Dr. Udeozor was guilty or innocent. Specifically, the first page of the verdict form asked the jury to determine Dr. Udeozor's guilt on each of the three charged counts; the second page asked the jury to answer "yes" or "no" questions regarding three special findings. For the reasons that follow, we hold that the district court did not abuse its discretion in giving the jury both of these forms at the same time.

Dr. Udeozor's contention that the district court was required to submit the special findings form to the jury separately from the general verdict form is incorrect as a matter of law. We of course acknowledge that, as a general matter, there has been a "presumption against special verdicts in criminal cases." *United States v. Milton*, 52 F.3d 78, 81 (4th Cir. 1995) (internal quotations omitted). However, whether to use a special verdict form "is a matter of the district court's discretion . . . ." *United States v. Reed*, 147 F.3d 1178, 1181 (9th Cir. 1998).

A special verdict form was justified in this case because, as this court has recognized, in the "uncertainty" between *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), "it was reasonable to assume that enhancements, other than prior conviction enhancements, had to be pled in the indictment and the facts supporting those enhancements found by the jury beyond a reasonable doubt." *United States v. Robinson*, 213 Fed. App'x 221, 223 (4th Cir. 2007).

Moreover, while it is better practice to submit the general verdict and special verdict forms separately, the district judge, both in the for-

mal jury instructions and in the verdict form, instructed the jury not to consider the three special findings unless it first found Dr. Udeozor guilty. This procedure has been recognized as an acceptable one. For example, in *United States v. Hedgepeth*, the Third Circuit found that the requirement that special interrogatories used for sentencing purposes must be submitted after a guilty verdict was satisfied "when jurors are instructed on a single form to answer the special interrogatory only after filling out a verdict of guilty or not guilty." 434 F.3d 609, 613 n.2 (3d Cir. 2006). Although submitting the two forms separately would have ensured that the jurors not "look[ ] down the page at the special findings before rendering a guilty verdict," we "must assume that the jury understood and followed the court's instructions." *Id.* at 614 n.4 (internal quotations omitted); *see also United States v. Ellis*, 121 F.3d 908, 921 (4th Cir. 1997). In light of the district court judge's clear instructions, we also cannot conclude that the judge abused his discretion in handing the jury two forms together rather than separately.

Dr. Udeozor makes two additional arguments regarding the special findings. First, she contends that the district court erred because it did not instruct the jury to specify the object or objects of the conspiracy that formed the basis for its finding of guilt. Because Dr. Udeozor did not request such an instruction at trial, we review this claim for plain error. *See United States v. Smith*, 451 F.3d 209, 217 n.4 (4th Cir. 2006). No plain error exists here. The jury found that the government had established beyond a reasonable doubt at least one object of the conspiracy, involuntary servitude. As this court and others have recognized, "a guilty verdict must be sustained if the evidence shows that the conspiracy furthered any one of the objects alleged." *United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003) (citing *Griffin v. United States*, 502 U.S. 56 (1991)).

Dr. Udeozor finally contends that the district court erred by including in the materials given to the jury during deliberations statements on the indictment form indicating that the grand jury had already made the special findings the trial jury was asked to make. We also review this claim for plain error, since Dr. Udeozor did not move to redact the challenged language, did not object to the content of the second superseding indictment in which the language was found, and did not object to the second superseding indictment being given to the

jury. Again, there is no plain error here. Dr. Udeozor relies upon this court's decision in *United States v. Lentz*, 383 F.3d 191, 219 (4th Cir. 2004), for her argument that the challenged statements which came before the jury constituted "prejudicial evidence that was not introduced at trial" such that she is entitled to a new trial. However, the page containing the statement to which Dr. Udeozor objects was part of the second superseding indictment, and an indictment is not evidence. *See, e.g.*, *Taylor v. Kentucky*, 436 U.S. 478 (1978). Therefore, we find that there is no basis for concluding that the district court erred with regards to the challenged language.

V.

We have reviewed with care each of Dr. Udeozor's remaining claims and conclude they are without merit. In particular, Dr. Udeozor's sentence of 87 months' imprisonment, which was at the low end of the guideline range, was procedurally and substantively reasonable under the standards set forth in *Rita v. United States*, 127 S.Ct. 2456 (2007), and *Gall v. United States*, 128 S.Ct. 586 (2007).

Dr. Udeozor has mounted a spirited challenge in this appeal. She urges that we "throw the book" at her former husband, but that we recognize her own innocence. In fact, she goes so far as to argue that the victim here was more akin to her "adopted daughter," and that she treated her as such. It is of course possible that the jury might have seen it that way. We must not ask, however, what the jury might have seen, but what it did. In the jury's view, Dr. Udeozor was part of a conspiracy that substituted for a promised education and compensation a regime of psychological cruelty and physical coercion that took some of the best years of a young girl's life. For that, involuntary servitude is not too strong a term.

The judgment of the district court is

*AFFIRMED.*