**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4030**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

ERIC ANTONIO MEJIA-RAMOS, a/k/a Flaco,

Defendant – Appellant.

**No. 17-4060**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

MIGUEL ANGEL MANJIVAR, a/k/a Garra, a/k/a Masflow,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Roger W. Titus, Senior District Judge. (8:13-cr-00496-RWT-7; 8:13-cr-00496-RWT-9)

Argued: September 20, 2019                    Decided: December 9, 2019

Before MOTZ, KING, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Motz and Judge King joined.

---

**ARGUED:** Gerald Chester Ruter, LAW OFFICES OF GERALD C. RUTER, P.C., Baltimore, Maryland; Mary Elizabeth Davis, DAVIS & DAVIS, Washington, D.C., for Appellants. Andrew Wallace Laing, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Christopher M. Davis, DAVIS & DAVIS, Washington, D.C., for Appellant Miguel Angel Manjivar. Brian A. Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, Appellate Section, Criminal Division, Catherine K. Dick, Assistant United States Attorney, William D. Moomau, Assistant United States Attorney, Teresa Wallbaum, Organized Crime and Gang Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert K. Hur, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Eric Antonio Mejia-Ramos and Miguel Angel Manjivar appeal their respective convictions for conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). Manjivar also appeals his conviction for murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a). For the following reasons, we affirm.

I.

The offenses in this case have their genesis in the defendants' membership in MS-13, a transnational street gang active throughout much of the United States. The defendants were each "homeboys," or full-fledged members, of different local subunits known as "cliques" of MS-13 in Prince George's County, Maryland. Largely through cooperating witnesses, the government established that Mejia-Ramos was a homeboy in the "Parque View" or "Parkview" clique, while Manjivar was a homeboy in the "Peajes" clique, and that each defendant committed a number of predicate acts of violence both as homeboys and to become homeboys in their respective cliques.

The defendants' claims on appeal concern, in various respects, the testimonies of five witnesses who implicated them in the killings by which they gained their homeboy statuses. Specifically, cooperating witnesses Oscar Parada-Ramirez, Dimaz Cruz, and Serfido Perez-Florian (among others) testified that Mejia-Ramos became a homeboy in the Parque View clique by participating in the murder of Ingrid Martinez in a wooded park in Beltsville, Maryland. Manjivar, for his part, confessed to cooperating witness Roni Arriola-Palma (among others) that he became a homeboy in the Peajes clique by

3

participating in the murder of Erlin Romero-Ramirez in a park in Hyattsville, Maryland. The circumstances of Romero-Ramirez's death were also illuminated by the testimony of his father, Jose Romero-Castro, who was in the park when his son was killed. The government established that the defendants murdered their respective victims because they perceived them to be "chavalas," or members of rival gangs, whom MS-13 members are encouraged to assault or kill.

The jury returned guilty verdicts for each defendant on the charge of conspiracy to participate in a racketeering enterprise, as well as a guilty verdict for Manjivar on the charge of murder in aid of racketeering. The district court sentenced each to life in prison, and also sentenced Manjivar to a consecutive term of 30 years. This appeal followed.

## II.

Mejia-Ramos raises three evidentiary challenges to his conviction. We review these issues, if preserved, for abuse of discretion, which we don't find unless the district court's evidentiary ruling "was arbitrary and irrational." *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003).[1] Even if we find an abuse of discretion, we will not reverse if the error was harmless within the meaning of Federal Rule of Criminal Procedure 52(a)—that is, if we can "say with fair assurance, after pondering all that happened without stripping the

---

[1] We omit internal quotation marks, citations, and alterations here and throughout unless otherwise noted.

4

erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Cole*, 631 F.3d 146, 154–55 (4th Cir. 2011).

Mejia-Ramos first argues that the district court abused its discretion under Federal Rule of Evidence 611(a) by permitting the government to reopen its redirect examination of Parada-Ramirez to ask a clarifying question. We do not agree.

Rule 611(a) empowers the district court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." District courts possess "broad discretion . . . in these core matters of trial management." *United States v. Lefsih*, 867 F.3d 459, 467 (4th Cir. 2017). Such discretion "clearly" extends to the granting of permission to recall a witness, *Kuhn v. United States*, 24 F.2d 910, 914 (9th Cir. 1928), or to reopen an examination, *United States v. Never Misses A Shot*, 781 F.3d 1017, 1023–24 (8th Cir. 2015); *see also United States v. Rucker*, 557 F.2d 1046, 1049 (4th Cir. 1977).

The reason for the government's clarifying question arises from the use of interpreters to facilitate much of the testimony. The record shows that when the government asked Parada-Ramirez on redirect "[b]y who[m]" he understood Martinez to have been killed (based on a conversation he'd had with Mejia-Ramos), the interpreter mistakenly translated the question so as to ask the witness "why"—"por que"—she'd been killed, to which Parada-Ramirez responded "because he told me she was a chavala." J.A. 399, 404–05. Though the government didn't realize the incongruity of this response until after it completed its examination, the district court exercised its discretion reasonably in

5

permitting the government to reopen its examination (before Parada-Ramirez even left the witness stand) to correct the mistranslation. The district court also exercised its discretion reciprocally, having permitted the defense to clarify a question from Parada-Ramirez's cross-examination just before allowing the government's clarifying question. Moreover, the government's clarifying question was undoubtedly harmless because Parada-Ramirez had given the same response—that he understood Mejia-Ramos to have killed Martinez— when asked the same question, without objection, on direct examination.

Mejia-Ramos also contends that the district court abused its discretion under Rule 611(a) because the subject of government's clarifying question wasn't raised on cross-examination. We reject this argument, too, because the district court's broad discretion over the mode and order of witness examination readily extends to allowing "inquiry into new subjects on redirect." *United States v. Starling*, 220 F. App'x 238, 244 (4th Cir. 2007) (per curiam); *accord United States v. Baker*, 10 F.3d 1374, 1406 (9th Cir. 1993), *overruled on other grounds by United States v. Buckland*, 335 F.3d 1053 (9th Cir. 2000). In any event, for reasons we have already explained, any such error was harmless.

### III.

Mejia-Ramos argues next that the district court abused its discretion under Federal Rule of Evidence 403 by permitting the government to elicit testimony from Cruz that he'd overheard Martinez tell a fellow Parque View clique member nicknamed "Perverso" that she belonged to a rival gang. Because Mejia-Ramos objected to Cruz's testimony only on hearsay grounds, we review his Rule 403 claim for plain error. To establish plain error,

6

Mejia-Ramos "must show (1) that the court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights, meaning that it affected the outcome of the district court proceedings." *United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014). "Even when this burden is met, we retain discretion whether to recognize the error and will deny relief unless the district court's error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.*

Rule 403 provides that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Though phrased in terms of exclusion, "Rule 403 is a rule of inclusion, generally favoring admissibility" and giving the district court "wide discretion to determine what evidence is admissible" thereunder. *United States v. Udeozor*, 515 F.3d 260, 264–65 (4th Cir. 2008). On appeal, "we review a district court's admission of evidence over a Rule 403 objection under a broadly deferential standard," finding error only "under the most extraordinary circumstances, where that discretion has been plainly abused." *Id.* at 265.

We find no error—plain or otherwise—in the district court's decision to permit the testimony. On one end of the scale, Cruz's testimony was plainly probative of the government's theory for why Mejia-Ramos killed Martinez: that he perceived her to be a "chavala." On the other end of the scale, Cruz's testimony presented no danger of unfair prejudice or confusion of the issues. That the government offered his testimony solely for its effect on the listener, and not for the truth of the matter asserted therein, was clear from

7

the irrelevance to the government's case of whether Martinez in fact belonged to a rival gang, while any lingering confusion over the testimony's limited use was "obviate[d]" by the district court's Rule 105 cautionary instruction. *See United States v. Powers*, 59 F.3d 1460, 1468 (4th Cir. 1995). And as Mejia-Ramos's own argument makes equally clear, the prejudice of Cruz's testimony derived wholly from its probative value, which means that its prejudicial nature wasn't "unfair" within the meaning of Rule 403. *See Mohr*, 318 F.3d at 619–20.

## IV.

Finally, Mejia-Ramos argues that the district court abused its discretion under Rule 611(c) by permitting the government to ask Perez-Florian this question: "[W]hat, if anything, did Mr. Mejia-Ramos say to you about firearms?" J.A. 521. Mejia-Ramos claims the question was leading and its answer harmful.[2] Once again, we disagree.

"The essential test of a leading question is whether it so suggests to the witness the specific tenor of the reply desired by counsel that such a reply is likely to be given irrespective of an actual memory." *United States v. Durham*, 319 F.2d 590, 592 (4th Cir.

---

[2] Perez-Florian responded that Mejia-Ramos "said it wasn't difficult to kill a person because you just needed one or two shots to the head and that was it." J.A. 521. Mejia-Ramos contends that this exchange was harmful to him because the government relied on a theory by which Martinez was shot instead of stabbed, such that Perez-Florian's earlier testimony that Martinez was stabbed undermined the government's case. It's not clear to us how this purported inconsistency in the government's theory harmed Mejia-Ramos. But even if the question were improper, we would reject this contention because the government's case didn't depend on the manner in which Martinez died.

1963); *see also De Witt v. Skinner*, 232 F. 443, 445 (8th Cir. 1916) ("The test of a leading question is whether it suggests or indicates the particular answer desired."). In other words, a leading question is one that "put[s] answers . . . in the mouth of [the] witness." *Durham*, 319 F.2d at 593.

The question that Mejia-Ramos challenges here fails these tests because it didn't suggest to Perez-Florian what answer the government was seeking to elicit or otherwise put words in his mouth. And even if the question were leading, the district court had broad discretion to permit such a question "when used with friendly witnesses to move direct examination along." *See United States v. Cephus*, 684 F.3d 703, 707 (7th Cir. 2012); *accord* Fed. R. Evid. 611(c) advisory committee's note.

Mejia-Ramos also argues that the district court abused its discretion because the subject of the question was outside the scope of Perez-Florian's direct and cross-examinations. He points out that while Perez-Florian testified on direct and cross-examination that Mejia-Ramos killed Martinez with a knife, firearms weren't mentioned until redirect. Because Mejia-Ramos didn't object on this ground at trial, any error must be plain. We find no error, plain or otherwise, because as discussed above, the district court possessed broad discretion "to allow inquiry into new subjects on redirect." *Starling*, 220 F. App'x at 244. And even if the district court abused this discretion, Mejia-Ramos makes no showing that the government's inquiry into the topic of firearms, which had no apparent connection to Mejia-Ramos's killing of Martinez, affected his substantial rights.

9

## V.

Manjivar, for his part, raises two grounds for vacating his convictions. He first argues that the district court abused its discretion under Rule 403 by permitting the government to call Romero-Castro as a witness, contending that the government offered the testimony of Romero-Ramirez's father solely as an emotional ploy. We disagree.

Rule 403 being, as discussed above, a rule of admission, "[w]e review a district court's admission of evidence over a Rule 403 objection under a broadly deferential standard," finding error only "under the most extraordinary circumstances," where the district court's "wide discretion" to admit evidence under this rule "has been plainly abused." *Udeozor*, 515 F.3d at 265. "[M]indful of the strong preference for admitting probative evidence," our review must also "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Simpson*, 910 F.2d 154, 157 (4th Cir. 1990).

The district court's decision to admit Romero-Castro's testimony doesn't amount to such an extraordinary circumstance. Though (like the rest of the government's evidence against Manjivar) Romero-Castro's testimony was circumstantial, it was nonetheless probative of Manjivar's involvement in Romero-Ramirez's death because Romero-Castro was the only witness present when he died. Romero-Castro testified that he was bicycling in a park when he heard a gunshot, followed by his son's pleading not to be killed by "them," followed by four more gunshots. J.A. 285. According to Romero-Castro, he then saw "all the[se] people" running out of the park before finding his son still alive on a

10

footbridge, watched the paramedics carry his son into the ambulance, and waited outside until the paramedics told him that his son had died. J.A. 285–86.

Romero-Castro was also the only witness to identify a photograph of his son for the jury. And while Romero-Castro didn't see who shot his son, his testimony was insightful on this point when juxtaposed with that of cooperating witness Carlos Beltran-Flores. Beltran-Flores testified that one day while he was living near the same park,[3] he received a call from Manjivar asking if he was home, followed by "a couple of gunshots" in the distance. J.A. 536. Moments thereafter, he received a visit from Manjivar, who came to his house to dispose of a .38 caliber revolver full of spent shell casings. In tandem with the testimony of Beltran-Flores, Romero-Castro's testimony suggests that Romero-Ramirez was the one whom Manjivar shot in the park.

We find that the danger of unfair prejudice inherent in Romero-Castro's testimony didn't outweigh, let alone substantially outweigh, its probative value. Our case law defines a danger of unfair prejudice as a "genuine risk that the emotions of the jury will be excited to irrational behavior," which must be "disproportionate to the probative value of the offered evidence" to justify exclusion under Rule 403. *Mohr*, 318 F.3d at 618.

While Romero-Castro's testimony concerned an emotional topic, the danger that it would stoke irrational factfinding was slight. For starters, Romero-Castro's testimony was succinct, spanning less than three pages of the record and comprising just 17 answers. His testimony was also matter-of-fact in its delivery, especially given its subject. For example,

---

[3] Beltran-Flores wasn't asked about the date of this incident.

11

Romero-Castro described the final moments of his son's life with stoic restraint, stating: "I was told when they were carrying him that he had been shot, but that he wasn't dead. Then they put in him the ambulance and the ambulance didn't move. It stayed there. Soon after, I was told that he died." J.A. 286. Romero-Castro didn't embellish or even emphasize the emotional nature of the events he witnessed, and the government didn't invite him to do so. Rather, he delivered the basic facts that he observed and promptly left the stand. Such testimony presented little to no danger of unfair prejudice.

VI.

Manjivar also argues that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose records pertaining to Arriola-Palma's participation in the Department of Justice's Witness Security Program. At an unrelated sidebar during cross-examination of Arriola-Palma, whose nickname in the Peajes clique was "Maniaco" (Spanish for "maniac"), Manjivar's counsel stated that

> [W]hile we're up here on the subject of witness protection, I did make a request a couple of days ago . . . that if [Arriola-Palma] were screened by wit sec, they normally do a psychological and since his name is one who is crazy, I asked if there was any mental health history because they do a psychological and, number two, I asked if there were any deceptive answers on the polygraph because they polygraph him. I never heard from anybody . . . .

J.A. 187. After the government advised that it "ha[d] no knowledge" of the request and "d[id not] have the records" because it "do[es]n't get that," Manjivar's counsel dropped the issue. J.A. 187–89.

12

Manjivar now contends that the government's failure to turn over Arriola-Palma's psychological and polygraph evaluations amounts to a *Brady* violation. To make out a successful *Brady* claim, Manjivar must show "that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." *United States v. Wolf*, 860 F.3d 175, 189–90 (4th Cir. 2017). "Favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

In an "atypical" *Brady* case such as this one, however, where the defendant cannot "specifically prove the materiality of suppressed evidence" because the government hasn't turned it over, the defendant "is not required to make a particular showing of the exact information sought and how it is material and favorable." *United States v. King*, 628 F.3d 693, 702–03 (4th Cir. 2011). Rather, he must "only make some plausible showing that exculpatory material exists." *Id.* at 703; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 870–71 (1982). If Manjivar makes the requisite showing, he "becomes entitled to have the information—not immediately disclosed to him—but submitted to the trial court for *in camera* inspection to determine if in fact the information is *Brady* material subject to disclosure." *King*, 628 F.3d at 703. And while the plausibility threshold isn't too demanding in this context, *see United States v. Abdallah*, 911 F.3d 201, 218 (4th Cir. 2018), "[m]ere speculation that the information may be helpful is insufficient to justify an *in camera* review," *United States v. Savage*, 885 F.3d 212, 221 (4th Cir. 2018).

13

Assuming without deciding that Manjivar's sidebar objection sufficed to preserve his *Brady* claim, we review the underlying legal issues de novo and factual findings for clear error. *Wolf*, 860 F.3d at 189. We conclude that Manjivar fails to make even a conceivable showing that the records at issue contain favorable evidence.

With regard to Arriola-Palma's psychological evaluation, we credit the government's assertion that no such record existed at the time of Manjivar's trial. As the relevant policy of the Witness Security Program provides, prisoner-witnesses like Arriola-Palma, who enter the program while in state custody, don't undergo a psychological evaluation "until the prisoner is between six to nine months from release." *Department of Justice Manual*, § 9-21.130. Because Arriola-Palma was still awaiting sentencing on his own racketeering conviction at the time of Manjivar's trial, there is no conceivable basis for concluding that he had undergone a psychological evaluation.

With regard to Arriola-Palma's polygraph results, though the government concedes that this record did exist at the time of Manjivar's trial, we find that it would not contain favorable evidence. To begin with, the relevant policy of the Witness Security Program provides that the purpose of the polygraph evaluation is simply to discover whether "the candidate intends to harm or disclose other protected witnesses or disclose information obtained from such witnesses." *Id.* § 9-21.340. We thus credit the government's assertion that Arriola-Palma's polygraph results wouldn't disclose any information pertinent to Manjivar's trial. Second, because this court has previously held "that the results of . . . a witness's polygraph test are not admissible to bolster or undermine credibility," *United*

*States v. Prince-Oyibo*, 320 F.3d 494, 497 (4th Cir. 2003), it follows that the results wouldn't disclose any favorable impeachment evidence, either.

## VII.

For the reasons given, we affirm the judgments of the district court.

*AFFIRMED*