**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LEOPOLDO CABRERA-BELTRAN, a/k/a George,

*Defendant-Appellant.*

No. 10-4084

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:09-cr-00323-LMB-1)

Argued: September 23, 2011

Decided: November 10, 2011

Before TRAXLER, Chief Judge, and WILKINSON and
NIEMEYER, Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Wilkinson and Judge Niemeyer
joined.

**COUNSEL**

**ARGUED:** Lionel Aron Pena, Edinburg, Texas, for Appellant. Jeffrey Brian Bender, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Kimberly Riley Pedersen, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

Leopoldo Cabrera-Beltran was convicted by a jury of conspiracy to import and distribute cocaine and heroin. He challenges his conviction and sentence on multiple grounds. For the reasons that follow, we affirm.

I.

"We recite the facts in the light most favorable to the Government." *United States v. Murphy*, 35 F.3d 143, 144 (4th Cir. 1994). Prior to 2007, the defendant worked for a Mexican drug trafficking organization in which Branden Dodson ("Dodson") was involved. In 2007, the defendant convinced Dodson to work directly for him and make both international and domestic drug-related trips at his direction. This drug trafficking and distribution scheme is best understood in terms of the vehicles used in the operation to transport drugs and money.

*Nissan Sentra*: Sometime in late December of 2006, Dodson assisted his fiancee, Stacy Dodson, in delivering a Sentra to Mexico to be outfitted with secret compartments. Once in Mexico, Dodson recruited Katrina Dodson, his sister-in-law,

to assist him in driving the Sentra from Mexico to Chicago. Upon arriving in Chicago, they met up with the defendant and another individual and followed them to a detached garage where the defendant directed them to leave the Sentra. The defendant paid Dodson $12,000 for the delivery.

In September of 2007, the Sentra was stopped, and a search of the vehicle yielded $146,845 concealed in the front fender. Dodson, the registered owner, was not in the vehicle; however, when Dodson received a DEA Notice of Seizure relating to the money, the defendant requested a copy.

*Nissan Murano*: In June of 2007, Dodson recruited Thomas Breeden to deliver a Murano to the drug organization in Mexico. While in Mexico, the two men met up with the defendant, who gave $10,000 to Dodson for the purpose of purchasing a Jetta.

*Volkswagen Jetta*: Dodson used the $10,000 to purchase a Jetta in the United States. The defendant assisted him in obtaining a permit required to drive the vehicle to Mexico. Dodson then delivered the Jetta to the defendant in Mexico. In August of 2007, Dodson used the Jetta to make two drug smuggling trips at the defendant's direction. In the first trip, he picked up the Jetta from the defendant in Mexico, drove it to Michigan, met the defendant, and then delivered it to Nebraska. He was paid $20,000 for this trip. In the second trip, he picked up the Jetta from the defendant in Nebraska and delivered it to the defendant in Mexico. Shortly thereafter, Dodson delivered the Jetta to the defendant's associate in Michigan and then drove it to the defendant in Nebraska. He was paid $23,000 for this trip.

In October of 2007, Dodson picked up the Jetta from the defendant in Nebraska and delivered it to him in Mexico. The defendant returned the Jetta to Dodson, and Dodson delivered it to the defendant in Missouri. Dodson then drove the Jetta to Nebraska and left the vehicle in an airport parking lot. The

defendant paid Dodson $20,000 for this trip. Similarly, in November of 2007, the defendant's associate gave Dodson the Jetta in Nebraska, and Dodson delivered it to the defendant in Mexico.

*Isuzu Rodeo*: In September of 2007, Breeden travelled to Mexico, picked up a Rodeo from the defendant, and drove it to Nebraska. He was paid $8,500 for making this trip. At some point during the trip, the Rodeo broke down, and the defendant provided assistance.

*Buick*:[1] In December of 2007, Breeden met the defendant in Omaha and delivered a Buick to the defendant and the defendant's brother in Chicago. The defendant paid Breeden and gave him additional money for Dodson to purchase another vehicle.

In January of 2008, Dodson was stopped in the Jetta at the United States-Mexico border. Customs officials recovered fifteen packages concealed in a hidden compartment. The packages contained 9.343 kilograms of heroin and 4.978 kilograms of cocaine. Dodson was arrested, and the defendant was subsequently arrested. Law enforcement searched two residences associated with the defendant and recovered evidence of drug activity. During the searches, law enforcement also found two vehicles with built-in hidden compartments. One of the vehicles was registered to the defendant.

The defendant was indicted and convicted of conspiracy to import and distribute cocaine and heroin. He was sentenced within the guidelines range after application of a three-level enhancement for his role in the illegal operation.

---

[1]The particular Buick model used in the conspiracy is unclear in the record.

## II.

The defendant's first contention is that his rights under the Sixth and Fourteenth Amendments were violated when the district court during voir dire struck three Spanish-speaking prospective jurors who expressed an inability to accept English translations of Spanish testimony and documents. The district court, sua sponte, struck these jurors for cause. Because the record establishes that the court did not abuse its discretion in dismissing the jurors, we reject this argument and affirm the district court.

During voir dire, the judge asked the prospective jurors whether any of them were "fluent in the Spanish language." Trial Transcript 37. She explained her reason for asking the question as follows:

> Now, the reason I'm asking you this question is you-all can see that we have interpreters here. I'm not sure if any of the witnesses who will be testifying in this case will be using interpreters, but it's extremely important that when a jury decides the case, if there is a foreign language involved, you must decide the case on the translation that is provided to everybody in the courtroom. We don't want basically a shadow translator in the jury box.

Trial Transcript 37-38. Three of the prospective jurors indicated some ability to understand the Spanish language, so the judge asked each of them a follow-up question concerning their ability to accept English translations of the Spanish language. Each of the prospective jurors expressed an inability to do so:

> THE COURT: If you were chosen to be a juror in this case and you disagreed with the interpretation or translation by the interpreters, could you base your decision on what the translator—all of these transla-

tors are court certified. Would you have any problem in basing your decision on what the translators have done?

PROSPECTIVE JUROR #1: Well, Your Honor, I'm certain if I disagreed with the translator, it would have to be a matter that I would bring up either to the Court or to fellow jurors. I've also testified in civil court in a foreign country in a foreign language, Portuguese in this case, and I know the differences between translation and what was actually said in the court, so it's a matter of some sensitivity to me.

. . .

THE COURT: [I]f you were to believe that the translators were not accurately translating what the witness might be saying, would you be able to base your decision on what the translator has said, or would you have problems with that?

PROSPECTIVE JUROR #2: It would depend on, you know, what was said. If, you know, the difference. I couldn't give you a specific yes-or-no answer.

. . .

THE COURT: All right. You've heard my question to the other two potential jurors. Would you have difficulty if you felt that there was a translation that you didn't agree with?

PROSPECTIVE JUROR #3: Yes.

Trial Transcript 38-39. The court, sua sponte, struck each of these prospective jurors for cause.[2] Of the three, only one was

---

[2]On this point, we note that this case does not involve the prosecutor's exercise of a peremptory strike. Accordingly, the defendant has not raised a claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny.

excused based solely on his inability to accept English translations. The other two were excused based on this inability and other factors. *See* Trial Transcript 80.

The defendant first argues that the striking of Spanish-speaking prospective jurors violated his right to Equal Protection under the Fourteenth Amendment. The Supreme Court's plurality and dissenting opinions in *Hernandez v. New York*, 500 U.S. 352 (1991), a factually similar case, guide our resolution of the defendant's Equal Protection claim. *Hernandez* involved a *Batson* challenge to the striking of two prospective Latino jurors. At trial, the prosecutor explained that his decision to peremptorily strike the potential jurors was based on his "uncertainty as to whether they could accept the interpreter as the final arbiter of what was said by each of the witnesses, especially where there were going to be Spanish-speaking witnesses." *Id.* at 356 (plurality opinion) (internal quotation marks omitted). A majority of the Court concluded that the prosecutor's rationale was a race-neutral basis for striking the jurors that did not contravene the Equal Protection clause. *See id.* at 372 (plurality opinion); *id.* (O'Connor, J., concurring).

Although *Hernandez* involved a *Batson* challenge rather than a for-cause challenge as in the instant case, seven of the Supreme Court justices in *Hernandez* took the opportunity to note that a juror's inability to accept a translator's interpretation would support a valid for-cause challenge. In the four-justice plurality opinion, the Court acknowledged that a juror's inability to accept a translation would be a valid for-cause challenge. *Id.* at 362-63 (plurality opinion) ("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character." (internal citation omitted)). Similarly, the three dissenting justices collectively espoused the same opinion. *See id.* at 379 (Stevens, J., dissenting) ("[I]f the prosecutor's concern was valid and substantiated by the record, it

would have supported a challenge for cause."); *id.* at 375 (Blackmun, J., dissenting) (concurring in that part of Justice Stevens' dissent).**³** Accordingly, in consideration of *Hernandez*, we hold that the for-cause striking of prospective jurors based on their perceived inability to accept an interpreter as the final arbiter of what was said or written does not violate the Equal Protection Clause of the Fourteenth Amendment.**⁴**

The defendant also argues that the striking of the prospective jurors violated his rights under the Sixth Amendment. In selecting a jury, "[t]he trial judge is in the best position to make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluations of . . . responses to questions." *United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996) (internal quotation marks omitted). Accordingly, "[a]s a matter of law, the trial court is to exclude veniremen who cannot be impartial." *United States v. Turner*, 389 F.3d 111, 117 (4th Cir. 2004). "We review challenges to the qualifications of jurors under an abuse of discretion standard." *Id.* at 115. "[A] district judge retains a very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion." *Id.* (internal quotation marks omitted).

---

**³**The remaining two justices in their concurring opinion did not necessarily disagree with the other justices on this point, deciding instead to limit their opinions to the context of the *Batson* challenge. *See Hernandez*, 500 U.S. at 375 (O'Connor, J., concurring) ("*Batson* does not require that a prosecutor justify a jury strike at the level of a for-cause challenge.").

**⁴**In this case, with the exception of one of the stricken potential jurors who volunteered that he was Cuban, *see* Trial Transcript 39, the record is silent on the ethnicity of the prospective jurors because the district court properly did not inquire into this fact. Similarly, in *Hernandez*, the prosecutor noted that he was "not certain as to whether [the stricken jurors were] Hispanics" because he "didn't notice how many Hispanics had been called to the panel." 500 U.S. at 356 (plurality opinion) (internal quotation marks omitted). Thus, as in *Hernandez*, the striking of the prospective jurors was unrelated to their ethnicity.

The Sixth Amendment entitles a defendant to a "trial[ ] by an impartial jury." U.S. Const. amend. VI. "[A] juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence *presented in court . . . ." Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984) (emphasis added); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due Process means a jury capable and willing to decide the case solely on the evidence before it . . . .").

It is integral to the promise of a fair trial that all jurors in a particular case base their decision on the same evidence. *See Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (noting "the requirement that the jury's verdict be based on evidence received in open court, not from outside sources").[5] Evidence that is received in open court is determined, in large part, by the district court, which "has broad discretion in the control of evidence." *United States v. Gomez*, 529 F.2d 412, 420 (5th Cir. 1976). In our view, the court's right to control the evidence may include requiring the jury to accept, as evidence, in-court translations by court-certified translators. We reach this conclusion because a juror who, during trial, refuses to accept a court-approved translation, in favor of his own interpretation of a language, is effectively deciding to base his verdict in the case on evidence different than that considered by the other jurors. Fundamental to our jury process is the requirement that all jurors consider the same evidence.

That the prospective jurors only anticipated the possibility that they would be unable to accept court-approved translations is sufficient to support the district court in light of the considerable discretion it is afforded in this area.[6] As a result,

---

[5]This concern is apparent in the practice of jury sequestration utilized to ensure jurors are not exposed to external evidence. *See, e.g.*, *United States v. Harris*, 458 F.2d 670, 674 (5th Cir. 1972) ("The purpose of sequestering is . . . to protect the jury from interference.").

[6]We note that when this kind of problem has previously arisen, other courts have acknowledged means of resolving it short of dismissing the

the district court's decision to strike the prospective jurors was not a manifest abuse of its discretion and did not contravene the Sixth Amendment.

## III.

The defendant's second contention also concerns the Sixth Amendment. At trial, the government used Treasury Enforcement Communications System (TECS) records to show that the defendant and other co-conspirators crossed the border on certain dates and in certain vehicles. The defendant argues that the admission of the TECS records into evidence violated his Sixth Amendment Confrontation Clause right to cross-examine the border patrol personnel who produced the information and statements contained in the TECS records. Because we hold that TECS records are not testimonial, we reject this argument.

According to the government's evidence, TECS is a case management system maintained by Customs and Border Protection, a division of the Department of Homeland Security. The system is used to keep a record of who and what enters the United States. The information contained in a TECS record may include "a person's name, date of birth, potentially what document they used, potentially which method they used to enter into the United States, and potentially

---

juror. *See, e.g.*, *Hernandez*, 500 U.S. at 364 (plurality opinion) ("Spanish-speaking jurors could be permitted to advise the judge in a discreet way of any concerns with the translation during the course of trial."); *United States v. Perez*, 658 F.2d 654, 662 (9th Cir. 1981) (quoting the district court judge who permitted jurors to address the court "when the witness is finished with his testimony" if they "hear certain words differently that [sic] you understand the interpreter to relate them"). Although *Hernandez* and *Perez* support the argument that the district court was not obligated to strike the prospective jurors, those cases do not conflict with our holding that the district court acted within its discretion in striking the jurors during voir dire based on their perceived inability to accept the translations of the court-certified translator.

which method they used to exit the United States." Trial Transcript 657. For vehicular border crossings, TECS maintains a record of the vehicles used and their license plates. For air travel across the border, TECS records may also include information on the departing and receiving airports.

At trial, the defendant objected to the admission of the TECS records on hearsay grounds only. He raised a Confrontation Clause argument for the first time in his Memorandum in Support of his Motion for a New Trial.

An objection to the admission of evidence must be both specific and timely. *See* Fed. R. Evid. 103(a)(1). The hearsay objection at trial cannot be understood to include a Confrontation Clause objection, *see United States v. Dukagjini*, 326 F.3d 45, 60 (2d Cir. 2003) (noting that "a hearsay objection would not in itself preserve a Confrontation Clause claim"), and the post-trial objection was untimely, *see United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983) ("Timeliness of objection under [Rule 103] requires that it be made at the time the evidence is offered . . . .") (internal quotation marks omitted); *cf. United States v. Gibbs*, 739 F.2d 838, 847-49 (3d Cir. 1984) (en banc) (holding that Confrontation Clause objection made for first time in Rule 29 Motion for Acquittal following government's case-in-chief, despite prior hearsay objection to same evidence, was untimely). Accordingly, the issue was not preserved for appeal, and we review for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This clause bars the introduction of out-of-court testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004). Inherent in this rule, however, is the limitation that "a statement must be 'testimonial' to be

excludable under the Confrontation Clause." *United States v. Udeozor*, 515 F.3d 260, 268 (4th Cir. 2008). "Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006).

The most comprehensive definition of the term "testimonial" is found in *Crawford*, where the Supreme Court provided three formulations of what it refers to as the "core class of 'testimonial' statements." 541 U.S. at 51. These formulations include:

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51-52 (internal quotation marks and citations omitted).

Interpreting *Crawford*, this court has concluded that "the 'common nucleus' of the 'core class' of testimonial statements is whether a reasonable person in the declarant's position would have expected his statements to be used at trial—that is, whether the declarant would have expected or intended to 'bear witness' against another in a later proceeding." *Udeozor*, 515 F.3d at 268. Recently in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), the Supreme Court held that a forensic laboratory report was testimonial and, therefore, "the analysts were subject to confrontation under the Sixth Amendment." 129 S. Ct. at 2540. Because the

defendant wishes to compare the TECS records in this case to the lab report in *Melendez-Diaz*, we review the facts of that case by comparison.

In *Melendez-Diaz*, the Supreme Court held that affidavits reporting the results of forensic analysis were testimonial because they fell within the "core class of testimonial statements" that the Court had previously laid out in *Crawford*. 129 S. Ct. at 2532 (internal quotation marks omitted). In reaching this holding, the Court relied heavily on the fact that the affidavits at issue were specifically created for trial purposes. *See id.* at 2539 (acknowledging that affidavits were made "for the sole purpose of providing evidence against a defendant"); *id.* at 2540 (noting that the analyst's statements contained in the affidavit were "prepared specifically for use at petitioner's trial").

Unlike the affidavits at issue in *Melendez-Diaz*, the TECS records in this case were not created for trial. To the contrary, the information contained in the TECS records was entered for the mere purpose of "maintain[ing] a record of what [was] coming into the United States." Trial Transcript 657. "The Customs Service officials who enter the license numbers of vehicles crossing the border into the TECS system have no motivation other than to mechanically register this unambiguous factual matter." *United States v. Puente*, 826 F.2d 1415, 1418 (5th Cir. 1987) (internal quotation marks omitted). As the Ninth Circuit has explained, TECS records are "records of routine, nonadversarial matters" and "the simple recordation of license numbers of all vehicles which pass [a] station is not of the adversarial confrontation nature". *United States v. Orozco*, 590 F.2d 789, 793 (9th Cir. 1979).

In *Melendez-Diaz*, the Supreme Court explained that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of

establishing or proving some fact at trial—they are not testi-
monial." 129 S. Ct. at 2539-40. This language does not mean
that all business and public records are non-testimonial. *See
United States v. Jackson*, 636 F.3d 687, 692 n.2 (5th Cir.
2011) (noting that under *Melendez-Diaz*, "business records
are not *per se* nontestimonial, but they are *generally*" (empha-
sis in original)). However, it does indicate that business and
public records are non-testimonial if they were "created for
the administration of an entity's affairs" rather than for "prov-
ing some fact at trial." *Melendez-Diaz*, 129 S. Ct. at 2539-40;
*see also id.* at 2538 ("Documents kept in the regular course
of business may ordinarily be admitted at trial despite their
hearsay status. But that is not the case if the regularly con-
ducted business activity is the production of evidence for use
at trial." (internal citation omitted)).

At least two federal courts have held that TECS records are
admissible under the public records exception to hearsay. *See
Puente*, 826 F.2d at 1417; *Orozco*, 590 F.2d at 793.[7] We
agree. The border-crossing information contained in the
TECS records was registered merely to administer the affairs
of the United States Customs and Border Patrol. This reason
is entirely unrelated to "proving some fact at trial." The TECS
records, thus, are non-testimonial, *see Melendez-Diaz*, 129 S.
Ct. at 2539-40, and their admission into evidence did not vio-
late the Confrontation Clause, *see Michigan v. Bryant*, 131 S.
Ct. 1143, 1155 (2011) (noting that "when a statement is not

---

[7]The applicable portion of the public records hearsay exception pro-
vides:

> [t]he following are not excluded by the hearsay rule . . . (8)
> Records, reports, statements, or data compilations, in any form,
> of public offices or agencies, setting forth . . . (B) matters
> observed pursuant to duty imposed by law as to which matters
> there was a duty to report, excluding, however, in criminal cases
> matters observed by police officers and other law enforcement
> personnel.

Fed. R. Evid. 803(8)(B).

procured with a primary purpose of creating an out-of-court substitute for trial testimony . . . the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause").

## IV.

The defendant next challenges his conviction under an indictment that charged him with conspiracy to import and distribute "1 kilogram or more" of heroin and "5 kilograms or more" of cocaine. J.A. 17-18. The jury found the defendant guilty of the heroin offenses in the same amount as alleged in the indictment. However, the jury found the defendant guilty of the cocaine offenses in the amount of "500 grams or more, but less than 5 kilograms," an amount less than that alleged in the indictment. J.A. 29-30. The defendant argues that his conviction on the lesser included offense amounted to a variance and thus requires reversal.

A defendant charged with conspiracy to import or distribute an amount of a controlled substance "can, if the evidence warrants, be convicted of one of the lesser included offenses" based on a smaller amount of the substance. *United States v. Brooks*, 524 F.3d 549, 555 n.9 (4th Cir. 2008). Such a verdict is permissible as "an offense necessarily included in the offense charged." Fed. R. Crim. P. 31(c)(1). Because the lesser included offense is included in the charged offense, there is no variance. *See United States v. Martinez*, 430 F.3d 317, 340 (6th Cir. 2005) ("[T]his results in neither a prejudicial variance from, nor a constructive amendment to the indictment because [the defendant] was merely convicted of a lesser-included offense and all the elements of the former necessarily include those of the latter.").

## V.

The defendant also argues that the indictment was defective. It is unclear whether the defendant argues that the indict-

ment suffered from multiplicity or duplicity. However, the defendant did not allege any defect in the indictment prior to trial as required by Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure. Because the defendant fails to provide a showing of good cause, his claim that the indictment was defective is waived. *See* Fed. R. Crim. P. 12(e); *United States v. Price*, 763 F.2d 640, 643 (4th Cir. 1985) (applying waiver rule to multiplicity and duplicity challenges where a defendant failed to raise the issues prior to trial).

## VI.

The defendant next contends that the trial court erred during jury deliberations by giving an *Allen* charge rather than granting a mistrial. After a three-day trial, jury deliberations began on the afternoon of October 8. At midday on October 9, the jury submitted a note to the court that read, "Judge, we cannot all come to an agreement. Do you want our response now?" Trial Transcript 841. The district court judge encouraged the jury to continue deliberating. Later that afternoon, the jury submitted a second note that read, "We have no unanimous verdict on any of the counts and do not foresee this happening." Trial Transcript 844. At that time, the judge gave the jury a modified *Allen* charge and dismissed the jury for the day. The jury reached a verdict the next day of court before lunchtime.

The defendant did not move for a mistrial after the jury announced its inability to reach a verdict, nor did he object to the giving of an *Allen* charge.[8] We therefore review the claims for plain error only. *See Olano*, 507 U.S. at 732; *United States v. Ford*, 88 F.3d 1350, 1363 (4th Cir. 1996).

"The court has considerable discretion and is in the best

---

[8]Counsel did object to the content of the *Allen* charge during trial but did not object to the court's decision to give the charge. The defendant does not pursue his content challenge on appeal.

position to gauge whether a jury is deadlocked or able to proceed further with its deliberations." *United States v. Seeright*, 978 F.2d 842, 850 (4th Cir. 1992). We cannot conclude that the district court judge in this case committed plain error in giving the modified *Allen* charge after receiving two jury notes expressing an inability to reach a verdict. Nor can we conclude that the court plainly erred by not, sua sponte, ordering a mistrial after approximately two days of jury deliberations.

## VII.

The defendant also contends that the district court should have granted his motion for acquittal because the evidence was insufficient to support his conviction. The "jury verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (emphasis and internal quotation marks omitted). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010) (internal quotation marks omitted).

The defendant does not challenge the quantity of the evidence. Rather, he argues that the testimony of the witnesses was vague, uncertain, and incredible. The jury has already assessed the credibility of the witnesses, and this court cannot do so on appeal. *See Murphy*, 35 F.3d at 148 ("The jury, not the reviewing court, weighs the credibility of the evidence . . . ."). Substantial evidence supported the verdict, and the district court did not err in denying the motion for acquittal.[9]

---

[9]The defendant's sufficiency claim concerning the discrepancy between the indictment and the verdict has been addressed in *supra* section IV and will not be readdressed here.

VIII.

The defendant next contends that the trial court erred by admitting the testimony of Lorenzo Salgado, who testified that he purchased heroin from the defendant on several occasions prior to any of the conduct alleged in the indictment. The district court admitted the evidence under Federal Rule of Evidence 404(b).

Under Rule 404(b),

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (internal quotation marks omitted). "To be admissible under Rule 404(b), prior bad acts evidence . . . must be relevant to an issue other than character, . . . necessary to prove an element of the crime charged, . . . [and] reliable." *United States v. Blauvelt*, 638 F.3d 281, 292 (4th Cir. 2011). Finally, the "probative value [of the evidence] must not be *substantially* outweighed by its prejudicial nature." *Id.* (emphasis in original).

We review the admission of such "bad acts" evidence for abuse of discretion. *See United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982). However, because "[j]udgments of evidentiary relevance and prejudice are fundamentally a matter of trial management, . . . we will not vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally in admitting evidence." *United States v. Benkahla*,

530 F.3d 300, 309 (4th Cir. 2008) (internal quotation marks omitted). The district court did not clarify the basis under Rule 404(b) upon which it was admitting the evidence. However, "we may sustain the admission of such evidence on any viable theory." *Blauvelt*, 638 F.3d at 292.

The government submits that the testimony is relevant to prove knowledge and intent. We agree. In drug cases, evidence of a defendant's prior, similar drug transactions is generally admissible under Rule 404(b) as evidence of the defendant's knowledge and intent. *See, e.g.*, *United States v. Branch*, 537 F.3d 328, 341-42 (4th Cir. 2008) (admitting evidence of prior arrest and conviction for possession with intent to distribute cocaine in subsequent prosecution for, *inter alia*, the same offense); *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004) (admitting evidence of prior possession and sale of cocaine in subsequent prosecution for, *inter alia*, possession of cocaine with intent to distribute).

Here, the conduct charged in the indictment is exceedingly similar to the conduct about which Salgado testified: the same drugs were sold in similar quantities and transported in a similar manner, even allegedly using the same car in one instance. Because the evidence helped establish the existence of a continuing distribution scheme, it was admissible under Rule 404(b). *See Hodge*, 354 F.3d at 312 ("[T]he evidence of [a defendant's prior] drug transactions was relevant and necessary in that it tended to show the existence of a continuing narcotics business . . . ."); *United States v. Sanchez*, 118 F.3d 192, 196 (4th Cir. 1997) ("A not-guilty plea puts one's intent at issue and thereby makes relevant evidence of *similar* prior crimes when that evidence proves criminal intent." (emphasis added)). Accordingly, rather than being admitted for an impermissible purpose, Salgado's testimony served to "prove [the defendant's] knowledge of the drug trade and suggest that he was an intentional, rather than unwitting, participant in the conspiracy." *Sanchez*, 118 F.3d at 195.

Finally, the probative value of the evidence was not substantially outweighed by unfair prejudice. In light of the government's evidence at trial, it is unlikely that the jury would react irrationally to Salgado's testimony, and any remaining danger of unfair prejudice was alleviated by the cautionary jury instruction given by the district court. *See United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997) ("In cases where the trial judge has given a limiting instruction on the use of Rule 404(b), the fear that the jury may improperly use the evidence subsides."). We therefore conclude that the district court acted within its discretion in admitting the evidence.

IX.

Finally, the defendant challenges his sentence on two grounds. He first argues that the district court erred in calculating the drug quantity by accounting for drugs that were sold to Salgado prior to the conduct alleged in the indictment. We review this issue for clear error. *See United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999). However, we need not consider the propriety of the district court's accounting for drugs sold to Salgado. The defendant's base offense level is the same even if the drugs sold to Salgado are excluded. Therefore, any error the district court may have made is harmless. *See* Fed. R. Crim. P. 52(a).

The defendant also submits that the district court erred by applying a three-level sentence enhancement for his managerial role in the conspiracy pursuant to § 3B1.1(b) of the sentencing guidelines. *See* U.S.S.G. § 3B1.1(b) (2009). We review this issue for clear error as well. *See United States v. Sayles*, 296 F.3d 219, 224 (4th Cir. 2002).

The "aggravating role" enhancement provides, in pertinent part, that "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." U.S.S.G. § 3B1.1(b). In classifying the role

played by a defendant, the district court considers, among other things, "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . and the degree of control and authority exercised over others." *Id.* § 3B1.1 cmt. 4. In this case, the defendant did not smuggle drugs himself. Instead, he played a managerial role that included recruiting Dodson, exercising control over the participants, making decisions about where and when to transport drugs and money, and providing payments to the participants. Considering these facts in light of the relevant factors set forth in comment 4 to § 3B1.1, we cannot conclude that the district court committed clear error in finding, based on a preponderance of the evidence, *see United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008), that the defendant was a manager or supervisor in the conspiracy.

The defendant also argues that the criminal activity did not "involve[ ] five or more participants" pursuant to § 3B1.1(b). However, the district court did not err in finding that five participants were involved, including the defendant, Dodson, Katrina Dodson, Thomas Breeden, and the individuals in Mexico who retrofitted the vehicles with compartments in which drugs and money were concealed. Therefore, the district court did not clearly err in applying the "aggravating role" enhancement to the defendant's sentence.

## X.

For the foregoing reasons, the defendant's convictions and sentence are affirmed.

*AFFIRMED*