**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4265**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

DAVON KELLY BENNETT, a/k/a Scooter,

Defendant − Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Elizabeth City. Terrence W. Boyle, District Judge. (2:15-cr-00020-BO-1)

Argued: May 9, 2018                         Decided: June 20, 2018

Before WILKINSON and NIEMEYER, Circuit Judges, and Richard M. GERGEL, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Patrick Michael Megaro, HALSCOTT MEGARO, PA, Orlando, Florida, for Appellant. Banumathi Rangarajan, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** John Stuart Bruce, United States Attorney, Jennifer P. May-Parker, First Assistant United States Attorney, Barbara D. Kocher, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Davon Kelly Bennett was convicted of numerous offenses related to drug dealing. At trial, the government introduced testimony from six witnesses who had previously signed cooperation agreements with the government, two statements Bennett made shortly after his arrest, testimony from an IRS agent who had helped investigate Bennett's financial assets, and additional evidence about Bennett's criminal history and his use of vehicles titled in other people's names. On appeal, Bennett challenges the district court's decision to limit cross-examination of the government witnesses and the admission of each of these types of evidence. Bennett also challenges the sufficiency of the evidence with respect to his convictions for money laundering and for possession of a firearm in furtherance of a drug trafficking crime. As discussed below, we reject each of Bennett's challenges and affirm the judgment of the district court in all respects.

I.

On March 4, 2015, a joint federal and state task force executed a search warrant on Bennett's home. During the search, the task force found more than $90,000 in cash, three firearms, titles to multiple cars in other people's names, and several cars parked on the property that were titled in other people's names. After the vehicles were moved to the sheriff's office, law enforcement found a hidden compartment in one of the cars that contained cocaine, heroin, another handgun, and another $60,100 in cash.

Law enforcement then brought Bennett to the local sheriff's office. While an officer was telling Bennett that he was about to read Bennett his *Miranda* rights, Bennett interrupted the officer to say that the police "should have come by tomorrow, I was going

3

to buy a whole bunch of weed." J.A. 101. Later, when Bennett was being fingerprinted, he told officers that he had not sold any "work" since the arrest of a drug dealer who went by the name "Dog Pound." J.A. 235.

Bennett was indicted on a litany of offenses related to drug trafficking: conspiracy to distribute and possess with the intent to distribute cocaine, cocaine base, heroin, and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 1); possession with the intent to distribute cocaine, heroin, and marijuana in violation of 21 U.S.C. § 841(a)(1) (Count 2); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3); and laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count 4).

Bennett then filed a pre-trial motion to suppress the statements he made at the sheriff's office on the ground that he was interrogated in the absence of full *Miranda* protections.[*] At a hearing on this motion, two law enforcement officers testified that the statements were made voluntarily. The district court found this testimony credible and held that there was "no evidence which would indicate" that Bennett's statements "were made in response to any questioning or any other behaviors designed to elicit incriminating information." J.A. 50. The statements were accordingly admitted as evidence.

---

[*] Bennett's motion actually requested that three statements he had made be suppressed, but because the third did not end up being used at trial, we do not consider it here.

At trial, the government introduced testimony from six witnesses who had purchased drugs from Bennett in the past and who had previously been prosecuted for drug offenses. All of these witnesses had signed cooperation agreements with the government in order to receive a lighter sentence. Bennett's counsel asked the first three witnesses if they were still bound by their cooperation agreements in an effort to imply that the agreements provided an incentive to fabricate testimony. During cross-examination of these first three witnesses, the court did not stop or limit this line of questioning except in one instance: when one witness who had served his sentence was asked if he was still bound by the agreement, the court interjected, "No, you're not. You're finished with your sentence." J.A. 303.

After the first three cooperating witnesses testified, the court excused the jury to determine whether Bennett's counsel should be able to question the three remaining witnesses in this way. The court felt that Bennett's counsel was giving the jury the "impression that somebody who was sentenced can serve their sentence, come back and not cooperate, and be sentenced to a more severe sentence." J.A. 365-66. The court was concerned that this raised potential double jeopardy concerns. It therefore instructed Bennett's counsel to avoid giving this impression in cross-examining the remaining witnesses. The court did not otherwise limit cross-examination or prevent Bennett from arguing that the witnesses were biased.

The government also introduced testimonial evidence that Bennett had been trafficking drugs for years. The indictment charged Bennett with selling drugs beginning in 2000. Five of the six cooperating witnesses testified exclusively about drug deals that

occurred after 2000. Their testimony was clearly admissible because it fell within the time period of the indictment and arose from the same series of transactions as the charged offenses. *See United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994). One witness, Terrence Cooper, testified that he had sold drugs to Bennett in the mid-1990s and also that he had purchased cocaine from Bennett on three occasions in 2003. Bennett objected to the inclusion of evidence of drug activities that occurred before 2000, as those activities fell outside the period covered in the indictment. The district court overruled the objection.

At trial, the government also sought to show that Bennett tried to conceal the proceeds of his criminal enterprise by purchasing a Toyota Sienna that was titled in the name of Theophus Moore. The government's theory was that Bennett purchased this car and titled it in another person's name in order to reduce his paper trail. This, the government argued, made it more difficult for the government to detect the income Bennett made selling drugs. To support its argument, the government showed that Bennett purchased the vehicle with cash, that he signed the name "Theo Moore" at the time of sale, and that he refused to let the previous owners go to the DMV to transfer the car's title. The government also introduced evidence that Bennett owned numerous vehicles besides the Toyota Sienna that were titled in other people's names. Because the indictment mentioned only the Toyota Sienna, Bennett objected to the admission of this evidence. He felt that the inclusion of evidence of other vehicle titles was demonstrative only of a pattern or practice. Again, the district court overruled the objection.

Finally, IRS Special Agent Douglas Miller, who worked on the financial aspects of the case in order to help identify Bennett's assets, testified about the investigation. During his testimony, the government asked Miller why one might purchase a vehicle in another's name. While Miller was responding, Bennett objected that Miller should not be allowed to answer the question because any answer would constitute expert testimony, and the government had not given notice of Miller's expected expert testimony. The court overruled the objection, and Miller explained that individuals involved in illegal activity often sought to minimize their paper trail and to reduce the likelihood of detection.

The jury found Bennett guilty on all four counts. Bennett now appeals the district court's decision to limit his cross-examination and to allow the introduction of the abovementioned evidence. He also challenges the sufficiency of the evidence regarding his charges for money laundering and for possession of a firearm in furtherance of drug trafficking.

## II.

Bennett first suggests that the district court improperly limited his ability to cross-examine the government's cooperating witnesses. He argues that the court prevented him from suggesting that the witnesses' cooperation agreements gave them "an incentive to relay biased and incredible testimony." Appellant's Br. at 24. We review a district court's limitation of cross-examination for abuse of discretion. *See United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012).

Bennett's argument fails for two reasons: it is factually incorrect because the district court allowed a great deal of questioning about whether the cooperation

7

agreements undermined the witnesses' credibility, and it is legally misguided because the district court acted well within its discretion.

At trial, after Bennett's counsel had already cross-examined three cooperating government witnesses, the district court ordered Bennett's counsel to refrain from implying that the government witnesses could have been resentenced if they had failed to cooperate with the government. Bennett claims that the district court "ruled that [Bennett] was precluded from questioning the Government's witnesses on their agreements based on future cooperation and prohibited [Bennett] from making an argument that the witnesses may be biased or unreliable as the result of their agreements with the Government." Appellant's Br. at 19. He contends that the witnesses believed that they were "obligated to testify on behalf of the Government," Appellant's Br. at 24, and that the court prevented him from arguing that the cooperation agreements gave the witnesses a motive to provide biased testimony.

The difficulty with this argument is that it is simply untrue. The district court did not prevent Bennett from arguing that the government witnesses were biased. In fact, there was extensive questioning about bias and motive during cross-examination. When asked about the cooperation agreements, the government's first three witnesses said that they believed that they "ha[d] to come to court and testify"; "ha[d] to testify for the government"; and "couldn't tell the government no, I won't testify." J.A. 304, 326, 352. When Bennett's attorney asked another witness "what would happen" if he refused to testify, the witness responded, "I'm assuming I would have been locked back up." J.A. 352.

8

It was only after these three government witnesses had finished testifying that the district court asked Bennett's counsel to refrain from "leav[ing] the impression that somebody who was sentenced can serve their sentence, come back and not cooperate, and be sentenced to a more severe sentence." J.A. 365-66. The district court was concerned that Bennett's counsel was giving a misleading impression about the Double Jeopardy Clause by implying that the cooperating witnesses had waived their double jeopardy protections. The court simply asked Bennett's counsel to avoid giving this impression.

This instruction did not, however, prevent Bennett from impugning the reliability of the remaining government witnesses. Rather, Bennett continued to ask the witnesses how the cooperation agreements influenced their behavior. This questioning prompted one witness to admit that he believed that the "plea agreement require[d]" him "to cooperate with the government." J.A. 457. Another stated that if he did not testify against Bennett, he would not "get . . . where [he] want[s] to go" as far as his sentence was concerned. J.A. 488. In addition, in his closing remarks Bennett continued to argue that the cooperation agreements rendered the government witnesses unreliable: "[F]or those cooperating witnesses who signed plea agreements that are still in effect, the motive to lie is right there in black and white." J.A. 565. Thus, throughout the trial, Bennett's counsel claimed that the witnesses felt that they were compelled to testify as a result of their cooperation agreements. He also sought to further impeach the witnesses' reliability by questioning them extensively about their criminal histories and about prior lies they had told to law enforcement.

9

In light of all this, it is unclear what exactly Bennett lost on account of the district court's order. District courts possess "wide latitude" to reasonably limit "cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Given the ample opportunity afforded to Bennett's counsel to impeach the witnesses' credibility, any additional cross-examination on this question would merely have been duplicative of information already available to the jury. Bennett's counsel may have wanted to emphasize a few things here and there. But after weighing the risk of prejudicing the jury and the ample evidence attacking the cooperating witnesses already at the jury's disposal, we cannot say the district court abused its discretion.

III.

Bennett also argues that the district court abused its discretion in allowing into evidence the two statements Bennett made shortly after his arrest. "When reviewing the district court's denial of a motion to suppress, we review factual findings for clear error and the legal determination that the statement was voluntary de novo." *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012). Because Bennett fails to show that these statements were made during an interrogation, we find no error in the district court's conclusion that Bennett's statements were voluntary. In any event, any error was certainly harmless.

The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

10

defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The purpose of a *Miranda* warning is to ensure that defendants are not interrogated without being informed of, inter alia, their right against self-incrimination.

But in order for *Miranda* protections to attach, an actual custodial interrogation must take place. In *Miranda*, the Supreme Court defined a "custodial interrogation" as any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. Interrogation thus requires at least some form of questioning. Statements made without any prompting on the part of law enforcement agents can therefore be admitted into evidence.

When considering Bennett's motion to suppress the two statements he made during his arrest, the district court determined that Bennett was not being interrogated when he made them and that they were voluntarily made. This determination was not error. "[S]ubstantial deference on the question of what constitutes interrogation must be paid to the trial courts, who can best evaluate the circumstances in which such statements are made and detect their coercive aspects." *United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992).

The district court in this case heard testimony from officers who were present when Bennett made the contested statements, and based on its determination that their testimony was credible, held that the statements were voluntary. The officers said that Bennett was not being questioned when he made the statements. On appeal, Bennett does

11

not point to any evidence overlooked by the district court that would indicate that he was being questioned. Rather, he simply asserts that the "specificity and nature" of the statements suggest that they were "made in response to questioning." Appellant's Br. at 29. But this is pure conjecture and directly contrary to the scenario described by the officers. Bennett does not provide a scrap of actual evidence to support his claim. There is therefore no reason to think that the district court erred in admitting these statements.

Moreover, even if the district court did err, any error was harmless. When determining whether a district court's admission of statements made in violation of the Fifth Amendment was harmless, we consider the following three factors: "(1) the importance of the statement to the government's case; (2) the impact on credibility of other evidence; and (3) the admission of prejudicial evidence based solely on the admission of the statement." *United States v. Giddins*, 858 F.3d 870, 886 (4th Cir. 2017).

Here, Bennett's statements plainly made no difference to the outcome of the case. They did not lead to the introduction of any material prejudicial evidence. Nor were Bennett's statements essential to connect him to any activities that formed the basis of any of his convictions. As we have noted, numerous witnesses testified about Bennett's criminal activities, and the government found large quantities of contraband when it searched his house and automobiles. Two stray remarks could hardly form a basis for overturning the jury's verdict given the overwhelming evidence presented at trial.

IV.

Bennett also contends that the district court violated Federal Rule of Evidence 404(b) by admitting two types of evidence that could only have been used to suggest a

propensity to commit drug crimes: a government witness's testimony that Bennett had purchased crack cocaine from him in the 1990s, and documentary and testimonial evidence that Bennett had purchased a number of vehicles that he titled in other people's names. In our view, however, this evidence goes to things other than propensity because it showed that Bennett had knowledge of the drug trade and that he intended to conceal the proceeds from his drug sales by purchasing vehicles titled in other people's names. It was therefore admissible under Rule 404(b)(2).

Evidence of a crime, wrong, or other act cannot be admitted solely "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence can, however, be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We review district court judgments about the relevance of evidence and its potential to bias the jury for abuse of discretion and "will not vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally in admitting evidence." *United States v. Cabrera-Beltran*, 660 F.3d 742, 755 (4th Cir. 2011) (quoting *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008)). Bennett fails to meet that burden.

## A.

Bennett claims that the court abused its discretion in allowing witnesses to testify about prior drug transactions "from a remote time in the past." Appellant's Br. at 37. Because the indictment charged Bennett with participating in a drug conspiracy that

began in 2000, he suggests that Terrence Cooper's testimony about sales that occurred in the mid-1990s could only have been used to prove propensity.

We disagree. "In drug cases, evidence of a defendant's prior, similar drug transactions is generally admissible under Rule 404(b) as evidence of the defendant's knowledge and intent." *Cabrera-Beltran*, 660 F.3d at 755. Here, Cooper's testimony showed that Bennett and Cooper had known each other for years as fellow actors in the drug trade. In establishing the nature and duration of their relationship, Cooper's statements lent credibility to his testimony by showing that Bennett had reason to think that Cooper was involved in the local drug market. It also indicated that Bennett had prior knowledge of the drug trade at the time of the charged offenses.

Even assuming the district court erred, any error was harmless. We will not reverse a Rule 404(b) error if there is "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994) (quoting *United States v. Nyman*, 649 F.2d 208, 211-12 (4th Cir. 1980)). Given the overwhelming physical and testimonial evidence about Bennett's drug dealings within the period specified in the indictment, we cannot say that the jury's judgment was substantially affected by this short exchange.

B.

Bennett raises another Rule 404(b) challenge in objecting to the district court's decision to admit evidence that he had titled vehicles in other people's names even

14

though some of those vehicles were not specifically listed in the indictment. He argues that this evidence could only have been used to prove his bad character.

But again, this evidence helped prove Bennett's knowledge and intent. The government sought to prove that Bennett laundered money. The government's theory was that Bennett concealed "his drug money by buying other assets that are in other people's names." J.A. 552. Evidence that Bennett had purchased numerous vehicles titled in other people's names speaks not simply to his character, but rather to his knowledge and intent by showing that he knew how to conceal the proceeds of his drug sales by, among other things, purchasing physical assets with cash.

And again, any error was harmless. The titles may well have provided some proof that Bennett used the proceeds from his drug transactions to purchase vehicles in other people's names, but it was far from the only evidence supporting this charge. The government also provided a great deal of evidence about the particular Toyota Sienna that was mentioned in the indictment. Altogether, the testimonial evidence established that Bennett was the person who actually possessed the title to the Toyota, that he purchased that van with cash, that he owned and operated the vehicle, that he refused to allow the prior owners to go to the DMV to transfer the car to Bennett's name, and that he paid Theophus Moore to allow the vehicle to be titled in Moore's name. This evidence provided the jury with plenty of reason to think that Bennett had laundered money, and any error that arose because the judge introduced additional evidence that Bennett held more than one vehicle titled in another person's name was harmless.

V.

Bennett also challenges the district court's decision to allow Special Agent Miller to testify without being disclosed as an expert. Bennett believes that the jury was prejudiced when Miller allegedly held himself out as an expert when he said that criminals try to reduce their paper trail to avoid being detected by the police. We review a district court's decision about whether to qualify a witness as an expert for abuse of discretion. *United States v. Garcia*, 752 F.3d 382, 390 (4th Cir. 2014).

Federal Rule of Evidence 701 allows a lay witness to give opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 701 prohibits district courts from admitting "expert testimony dressed in lay witness clothing, but it 'does not interdict all inference drawing by lay witnesses.'" *United States v. Perkins*, 470 F.3d 150, 156 (4th Cir. 2006) (quoting *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000)). Rule 702, by contrast, permits an expert to testify if, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

In this case, the government called Miller as a lay witness, but Bennett suggests he in fact testified as an expert in offering one particular statement. Miller said that in his experience, the simple fact that a vehicle was titled in a person's name did not by itself indicate that the vehicle belonged to that person. Rather, he explained that individuals involved in illegal activity activities "try to keep the paper trail nonexistent as it relates to

16

their name on particular assets." J.A. 515. The rest of Miller's testimony summarized the findings of his investigation of Bennett's financial assets.

While we have recognized that there can be a "fine line" between evidence admitted under Rule 701 and under Rule 702, *Perkins*, 470 F.3d at 155, Miller's statement did not cross that line. The statement Bennett challenges bore little relationship to any expertise Miller might have developed over the course of his law enforcement career. It was an ordinary observation that criminals have an incentive to avoid detection by reducing their paper trail and keeping their names off financial assets. Miller was simply offering an opinion, and a fairly obvious one at that.

Again, assuming that the district court erred in admitting this statement, the error was harmless. As we have explained, the evidence against Bennett was overwhelming. Miller's statement followed extensive factual testimony about the lengths Bennett went to in order to conceal his drug trafficking proceeds. There is no reason to think that Miller's statement that criminals try to hide their crimes colored the jury's verdict.

VI.

Finally, Bennett challenges the sufficiency of the evidence with respect to his conviction for possession of a firearm in furtherance of a drug trafficking crime (Count 3), and for money laundering with intent to conceal the source of the funds as drug trafficking proceeds (Count 4). When reviewing the sufficiency of the evidence, we grant "the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).

17

There was clearly sufficient evidence to support Bennett's firearm and money laundering convictions. To sustain a charge for money laundering, the prosecution must show that "(1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a specified unlawful activity; (3) the defendant knew at the time of the transaction that the property involved proceeds of an unlawful activity; and (4) the defendant intended to promote the carrying on of the specified unlawful activity." *United States v. Singh*, 518 F.3d 236, 246 (4th Cir. 2008). As we have already discussed, the government introduced a wealth of physical and testimonial evidence showing that Bennett purchased cars in other people's names, and that he did so in order to conceal the proceeds of his drug dealing activity. It showed that Bennett had numerous vehicles titled in other people's names, that he went to great lengths to conceal the ownership of these vehicles, and that he failed to file tax returns. Based on this evidence, the jury reasonably concluded that Bennett purchased automobiles in order to conceal the proceeds of drug sales.

The evidence supporting Bennett's conviction for possession of a firearm in furtherance of a drug trafficking crime was equally robust. To sustain this conviction, the government had to show that possession of a firearm somehow furthered, advanced, or assisted with a drug trafficking crime. *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). The government advanced a clear theory about why Bennett kept a gun: "When he's delivering those drugs, wouldn't it be good to have a handgun there to help protect the drugs you're delivering and the money you're picking up?" J.A. 550. This was not mere conjecture. Law enforcement officers found a gun in a hidden compartment of

18

one of Bennett's cars along with heroin, cocaine, and a pile of cash. Given the extent of Bennett's drug dealing, and given that the firearm was stored in a hidden compartment alongside drugs, the jury had more than enough reason to think that the firearm helped Bennett in trafficking drugs.

## VII.

The judgment of the district court is accordingly

*AFFIRMED.*