**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-4482**

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

        v.

TROY AURELIUS TITUS,

             Defendant – Appellant,

        v.

STEPHANIE OLSEN; RITA MAE CANNIZZARO,

             Parties-in-Interest.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Raymond A. Jackson, District Judge. (2:08-cr-00154-RAJ-DEM-1)

Argued: March 22, 2012              Decided: April 13, 2012

Before DUNCAN, AGEE, and DIAZ, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Andrew Michael Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellant. Michael Calvin Moore, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia;

Melissa E. O'Boyle, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Troy Titus of mail fraud, wire fraud, conspiracy to commit mail and wire fraud, and various other offenses arising from an operation that bore the hallmarks of a Ponzi scheme. On appeal, Titus raises numerous claims, challenging pretrial, trial, and posttrial rulings by the district court. Finding no error, we affirm.

I.

A.

Because Titus was convicted by a jury, the following facts are recited in the light most favorable to the government. See United States v. Cabrera-Beltran, 660 F.3d 742, 746 (4th Cir. 2011). Prior to the revocation of his law license in 2005, Titus ran his own law firm in the Tidewater Region of Virginia. Co-conspirator and co-defendant Kristen Cardwell worked with him.

In his capacity as an attorney, Titus assumed various roles. These roles included serving as trustee for the trust accounts of many clients, a responsibility that allowed him access to the funds in those accounts. He also acted as a real estate settlement agent, handling funds from one or more sides of real estate transactions. In furtherance of this role,

3

Titus's law firm maintained a trust account for real estate settlement activities with Monarch Bank (the "Monarch account").

In addition to his activities as an attorney, Titus led seminars on real estate investment, estate planning, and tax avoidance. Titus solicited seminar attendees to become clients of his law firm and invest funds with him in ventures that often involved the purchase of real estate. Titus assured these individuals that their investments would be secured by first or second liens on other real property.

In his various roles, Titus was subject to certain statutes, regulations, and professional rules. For example, Titus's trustee relationship with his clients was governed by, inter alia, the Virginia State Bar's Rules of Professional Conduct. As relevant here, the Rules impose a duty on an attorney to avoid representation of "a client if the representation involves a concurrent conflict of interest" unless the client "consents after consultation, and . . . the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client." Va. Rules of Prof'l Conduct R. 1.7. The Rules go on to prohibit certain transactions by an attorney that run particular risks of conflicts of interest:

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an

4

ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

(b) A lawyer shall not use information relating to representation of a client for the advantage of the lawyer or of a third person or to the disadvantage of the client unless the client consents after consultation.

Id. at R. 1.8. In addition, Virginia law imposes a duty of loyalty on all trustees, requiring each trustee to "administer the trust solely in the interests of the beneficiary." Va. Code Ann. § 55-548.02(A).

Titus's activity as a real estate settlement agent was governed by the Virginia Consumer Real Estate Settlement Protection Act ("CRESPA"), codified in sections 55-525.16-525.32 of the Virginia Code, which sets forth the duties and responsibilities of real estate settlement agents. CRESPA requires real estate settlement agents to hold settlement funds in "fiduciary trust . . . accounts," and to keep the funds "segregated for each depository . . . in the records of the settlement agent in a manner that permits the funds to be

5

identified on an individual basis." Va. Code. Ann. § 55-525.24(A)(1). CRESPA also requires that "[t]he funds . . . be applied only in accordance with the terms of the individual instructions or agreements under which the funds were accepted . . . [and] disbursed only pursuant to a written instruction or agreement specifying how and to whom such funds may be disbursed." Id. at §§ 55-525.24(A)(2), (B). In addition, CRESPA prohibits the intentional making of "any materially false or misleading statement or entry on a settlement statement." Id. at § 55-525.25.

B.

By the early 2000s, Titus was experiencing serious financial difficulties. In addition to significant expenses associated with the operation of his law firm, Titus was saddled with additional expenses totaling around $65,000 per month. Titus had also amassed a running shortfall in the Monarch account of approximately $2.5 million. To overcome these financial difficulties Titus began defrauding his legal clients and real estate investors.

Titus fraudulently obtained funds via three avenues: by embezzling funds from his clients' trust accounts, by misusing

property entrusted to him by his clients,[1] and by misappropriating funds from his real estate investors. Titus began by using the funds to cover his monthly expenses and backfill his shortfall in the Monarch account. Later, in classic Ponzi scheme fashion, Titus began using more recently acquired funds to make payments to earlier victims.

By 2005, Titus's scheme was unraveling. Multiple clients' accounts were running shortfalls, and Titus owed massive amounts to his real estate investors. Complaints by his legal clients led to an investigation by the Virginia State Bar. This investigation ended with Titus stipulating to his mismanagement of trust accounts and agreeing to surrender his law license. The FBI began investigating his activities, which led to the underlying criminal action.

C.

A federal grand jury indicted Titus for bank fraud, in violation of 18 U.S.C. § 1344 (Count One); conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count Two); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Three though Twenty-Six); mail fraud, in violation of 18 U.S.C. § 1341 (Counts Twenty Seven though Thirty-One); promotional money

---

[1] For example, on multiple occasions Titus used his clients' property to secure loans from his investors.

7

laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (Counts Thirty-Two though Forty-One); and engaging in financial transactions with criminally derived property, in violation of 18 U.S.C. § 1957 (Counts Forty-Two though Forty-Nine). Titus's trial lasted approximately six weeks and included testimony from over 60 witnesses. These witnesses included victims, clients, investors, record custodians, bank employees, law enforcement, Titus's co-conspirator, and Titus himself. A jury convicted Titus on the conspiracy count, 16 of the wire fraud counts, two of the mail fraud counts, four of the money laundering counts, and seven of the financial transactions with criminally derived property counts. The district court sentenced Titus to 30 years in prison. This appeal followed.

We set forth additional facts below as necessary.

II.

On appeal, Titus claims multiple errors by the district court. Titus first argues that the district court erred by denying his pretrial motion for a continuance. Titus next argues that the district court erred in admitting certain evidence during his trial. Titus also asserts that the district court violated his right to a fair trial by showing bias against his defense counsel. Titus further claims that the district court erred in limiting his testimony to just over two full days

8

of trial. Finally, Titus argues that the district court erred in denying his posttrial motion for acquittal. We address each of these claims in turn.

A.

We first consider whether the district court erred in denying Titus's pretrial motion for a continuance. Our standard of review in this regard is a deferential one. "[A] trial court's denial of a continuance is . . . reviewed for abuse of discretion; even if such an abuse is found, the defendant must show that the error specifically prejudiced her case in order to prevail." United States v. Hedgepeth, 418 F.3d 411, 419 (4th Cir. 2005). "[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (quotation marks omitted).

Against the foregoing standard, we consider the facts. The district court appointed a federal public defender to represent Titus following his initial indictment and set the original trial date for June 29, 2009. After the grand jury handed down a third superseding indictment, Titus moved for, and the district court granted, a continuance until October 6, 2009.

On August 10, 2009, Titus moved to replace the federal public defender with private counsel. The government initially opposed the motion, expressing concern with bringing in new counsel less than 60 days before trial. Although eventually withdrawing its opposition, at an August 17, 2009, hearing on the motion the government emphasized that it "continue[d] to believe that there's absolutely no way that new counsel coming into this case could be prepared to try it in less than 60 days." S.J.A. 87. The government voiced concern that were the substitution allowed and the October 6 trial date maintained,

> one of two things is going to happen: Either A, Mr. Sacks is going to come in on the eve of trial after we have put all these arrangements in place and made all these arrangements for the witnesses to be here, and he's going to say I just realized that I don't have enough time despite my representation before that I did; or alternatively, we are going to be back here in a few years on 2255 because he had insufficient time to get ready.

Id. at 89. In response, Titus's private counsel assured the district court that "if the Court ordered that this trial go forward on October 6th, then I will be ready. I will do what I have to do to be ready." Id. at 91. The district court continued the case despite counsel's representations, stating:

> [R]ecognizing that we are at a stage here where we are less than 60 days out from this trial, the Court doesn't want to come back in here and be confronted with a continuance in this case after everyone is keyed up to go and et cetera. So what the Court is going to do is the Court is going to on its own volition move this case out, move it out approximately

10

30 days, to be sure that we can deal with what we have to deal with here and we won't have to come back in here because of adjustments having to be made because of a time schedule.

Id. at 95-96. The district court granted Titus's motion to substitute counsel and sua sponte set November 10, 2009, as the new date for trial.

More than two months after the hearing and approximately two weeks before the November 10 trial date, Titus's counsel filed a motion to continue. Counsel argued that he could not be prepared to try such a complex case without additional time. In opposing the motion, the government noted that it had made "extensive travel arrangements . . . to organize more than 70 government witnesses, many of whom are elderly and some of whom must travel from abroad for this hearing" and that it had relied "on Defense Counsel's representations that he would be ready, [and] scheduled . . . other trials based around this trial date, making it extremely difficult to find a date even into 2010 that would allow for a month-long trial." J.A. 260-61.

The district court denied the motion by memorandum opinion:

The Court in good part allowed Defense Counsel to come into the case at such a late date because of his affirmations that he would be ready even at the October 6, 2009 trial date if necessary. Defense Counsel represented at the continuance hearing that "I am more prepared, frankly, in two months than the public defenders were in ten." The Court will rely on Defense Counsel's representations of diligence in preparation, given his experience and skill in trying cases and the resources he has had available to him

11

> over the past several months. The Court is confident
> that Defense Counsel will provide the Defendant
> effective representation, and finds that on balance,
> no prejudice will result.

Id. at 265 (quoting J.A. 244).

Titus argues that, despite counsel's insistence at the August 17, 2009, hearing that he would be ready for trial on October 6--more than a month earlier than the ultimate trial date--once his counsel "delved into the case, which was document intensive and complicated by the fact that [Titus] was in custody pending trial, it became apparent . . . that [counsel] had underestimated the time he would need to adequately prepare a defense with the defendant." Appellant's Br. 13. Titus argues that the district court abused its discretion in allowing his counsel only 12 weeks to prepare for a 20-day jury trial on 49 counts.

Notable, however, is what Titus does not argue. Titus does not allege that the government was dilatory in providing discovery or in any other way contributed to a lack of preparation.[2] Titus points to nothing specific in the trial record to demonstrate any prejudice caused by his counsel's supposed lack of preparation. And importantly, Titus does not

---

[2] To the contrary, as noted by the district court, the government went to great lengths to aid counsel's preparation. See J.A. 262-63.

12

argue that the district court was either "arbitrary" or "unreasoning" in denying the continuance, as is required to find an abuse of discretion in this circumstance. See Slappy, 461 U.S. at 11-12. Accordingly, Titus's argument must fail.

In an excess of caution we note as well that had Titus made the appropriate arguments, his contention would still be unavailing. We have held that "the burdensome task of assembling a trial counsels against continuances, and, therefore, the trial courts must be granted broad discretion." United States v. LaRouche, 896 F.2d 815, 823 (4th Cir. 1990). Here, the district court, both at the hearing at which it approved the substitution of counsel and provided for a continuance on its own motion and later in denying the subsequent continuance, appropriately balanced the interests of the defendant with the need to manage its docket, accommodate the schedule of counsel, and accommodate witnesses who would be traveling in from out of town. Thus, the district court was neither arbitrary nor unreasoning. Indeed, the 12 weeks provided to Titus's counsel is much more generous than that provided in similarly complex cases where we have found no abuse of discretion. See, e.g., LaRouche, 896 F.2d at 823-24 (finding no abuse of discretion in providing 34 days to prepare for complex, multidefendant trial); United States v. Badwan, 624 F.2d 1228, 1230-31 (4th Cir. 1980) (similar, providing three

13

weeks to prepare for trial). For these reasons, we find no abuse of discretion here.

B.

We now turn to Titus's evidentiary arguments, beginning with Titus's challenge to the admission of his stipulation to revocation of his law license. We then turn to his challenge to the district court's taking judicial notice of certain Virginia rules and statutes. Both challenges are governed by Federal Rule of Evidence 403,[3] which allows a district court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, [or] confusing the issues." We have characterized this prejudice as "tend[ing] to subordinate reason to emotion in the factfinding process." United States v. Queen, 132 F.3d 991,

---

[3] Titus frames his challenge to the admission of the stipulation to revocation of his bar license as arising from Federal Rule of Evidence 404(b), which prohibits the introduction of evidence of past bad acts by a person "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such prior bad act evidence is allowed, however, to prove, among other things, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. at 404(b)(2). Titus does not argue that the district court admitted the stipulation for an improper purpose, but instead argues that the potential for prejudice outweighed the probative value associated with that purpose. Thus, Titus's challenge is more properly considered to be arising from Rule 403, rather than 404(b).

997 (4th Cir. 1997).  In reviewing a district court's balancing of probative value against potential for prejudice, we have a history of "broad deference" to the district court.  See, e.g., United States v. Myers, 280 F.3d 407, 413 (4th Cir. 2002) ("We must review the lower court's application of this balancing test with . . . broad deference."); United States v. Love, 134 F.3d 595, 603 (4th Cir. 1998) ("We . . . review a district court's admission of evidence over a Rule 403 objection under a 'broadly deferential standard.' "  (quoting United States v. Simpson, 910 F.2d 154, 157 (4th Cir. 1990))).  We will overturn a district court's decision to admit evidence in such circumstances only "under the most extraordinary of circumstances."  United States v. Aramony, 88 F.3d 1369, 1377 (4th Cir. 1996) (quotation marks omitted).

### 1.

We first review the admission of Titus's stipulation to the revocation of his law license.  As noted above, the primary motive offered by the government to explain Titus's misdeeds was his serious financial straits.  Titus had shortfalls in many accounts over which he had control.  The largest of these shortfalls--approximately $2.5 million--was in the Monarch account, his law firm's real estate settlement account.  Part of the government's theory was that Titus used investor and client funds to try to pay down that deficit.

15

Most of the allegations to which Titus stipulated involved irregularities and deficiencies in the accounts over which Titus had control. For example, paragraphs 14-19 of the stipulation deal specifically with shortfalls in the Monarch Account. In addition, the stipulation contains descriptions of unsavory conduct on Titus's part. For example, it describes instances of Titus assuring Virginia Bar officials that he had taken some action when, in fact, he had not.

Titus objected to admission of the stipulation, arguing that although the parts detailing account shortfalls were acceptable, the district court should redact portions describing his bookkeeping problems and false statements because they would prejudice the jury. The government responded that the parts of the stipulation with which Titus took issue were essential to prove that Titus knew about the shortfalls in the Monarch account, and, more broadly, to document his overall financial difficulties. After hearing argument from both sides, the district court considered the document during a recess and ultimately approved its admission. The district court concluded that the significant probative value of the stipulation outweighed the minimal risk of prejudice, especially given that it tended to show confusion on Titus's part, which supported his claim that he did not have the specific intent to commit fraud:

> When you read these paragraphs [of the stipulation], these paragraphs in some way tend to affirm what the defendant has been saying about the reason he did what he did, that he had some confusion with the trust accounts in his firm, that he was trying to get it straightened out. A lot of these paragraphs are dealing with the efforts of, trying to straighten out the defendant's records, which some might argue or suggest that that shows the lack of fraudulent intent, that he was just having problems with his records, which the defendant has argued. So the Court believes on balance that it's appropriate to admit.

J.A. 1435.

Titus argues on appeal, as he did at trial, that the prejudicial impact of the stipulation outweighed its probative value, and therefore it should not have been admitted. As Titus puts it:

> The risk for prejudice and misleading of the jury in providing the . . . stipulation was simply too great, and the district court abused its discretion in admitting the materials into evidence and created a substantial risk that the defendant would be convicted based on an uncharged ethical violation during a Virginia State Bar investigation.

Appellant's Br. 18. We disagree. As noted above, a district court's decision to admit evidence in such circumstance will be overturned only under the most extraordinary of circumstances. Aramony, 88 F.3d at 1377. No such circumstances are present here. On the contrary, it is clear that the district court thoughtfully balanced the probative value of the stipulation against its potential for prejudice, and we will not second-guess that balancing. Accordingly, we reject Titus's challenge

17

to the admission of the stipulation to revocation of his law license.

2.

We next consider Titus's challenge to the admission by judicial notice of certain Virginia rules and statutes. Central to the government's theory of the case was that Titus committed fraud, in part, by failing to fulfill his duties of disclosure to his clients and investors. To demonstrate the duties that Titus owed to his clients and investors, the government asked the district court to take judicial notice of the Virginia Rules of Professional Responsibility 1.7 and 1.8 (quoted above), which created duties to his clients, and CRESPA (quoted above) with its associated state regulations, which imposed duties on Titus when he acted as a settlement agent for real estate closings and held funds in trust for those closings. Titus objected, arguing that the statutes were not probative and would confuse the jury:

> [T]he danger that is created is that the jury would convict him of a crime because they think he violated a regulatory, a State Bar standard. That would be highly prejudicial. That's not the law. That's simply not the source of criminal liability. It's prejudicial. . . . How are they going to understand?

J.A. 787. The district court overruled Titus's objection, stating:

> [T]he Court is fully capable of advising this jury of what criminal statutes this defendant is indicted on, and one of the common instructions is to instruct the jury that the defendant is not on trial for any matter

18

> not charged in this indictment. He's not on trial for conflict of interest or misusing escrow funds or any regulatory violation. That is not a problem for the jury to understand this. But these regulatory matters are certainly circumstantially useful and probative in establishing whether the defendant acted with intent to establish an artifice to defraud.

J.A. 788. In fact, in instructing the jury at the close of evidence, the district court explicitly addressed this issue. After providing the text of the documents, the district court instructed the jury: "During your deliberations you may consider these statutes and rules in determining whether the defendant violated certain duties as part of the scheme and artifice to defraud. However, the court cautions you that the defendant is not on trial for violating these statutes." J.A. 2924.

Titus advances on appeal the same argument made in the district court. Titus asserts that the statutes and rules were "irrelevant to the conduct charged in the Indictment" and were prejudicial because there was a high risk that they would confuse the jury and that the jury would convict him based on violations of state law, rather than the crimes for which he was charged. Appellant's Br. 21. The government disagrees, contending that "Titus's conduct made the Virginia Rules of Professional Conduct and the Virginia Code sections governing real estate settlements highly relevant," Appellee's Br. 53, as the indictment included theories of criminal liability covering "unlawful conversion of funds held in trust and various breaches

19

of fiduciary duties to clients that caused economic loss," to which the statutes and rules were directly related, id. at 54. The government further argues that the above-noted jury instruction cured any potential jury confusion.

Reviewing--with broad deference--the district court's balancing of the probative value of the rules and statutes against their potential to confuse the jury, we find no abuse of discretion. First, it is clear that the rules and statutes were highly relevant to the government's case. To prove a mail or wire fraud violation, the government must generally establish: (1) the existence of a scheme to defraud; (2) the use of the mails or wires in furtherance of the scheme; (3) a material statement or omission in furtherance of the scheme; and (4) specific intent to defraud. 18 U.S.C. §§ 1341, 1343; United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008). A scheme or artifice to defraud, in turn, may arise from a failure to disclose material information pursuant to a fiduciary, statutory, or other legal duty. United States v. Colton, 231 F.3d 890, 898 (4th Cir. 2000). These rules and statutes evidence Titus's duties to disclose information and are, accordingly, vital to prove, as the government was seeking to do, mail and wire fraud charges based upon a failure to disclose such information in violation of these duties.

Second, the risk of jury confusion does not substantially outweigh the probative value of this evidence. Any risk that the jury could become confused and render a guilty verdict on the basis of a violation of these state rules and statutes, rather than on the basis of the federal law upon which Titus was indicted, was cured by the district court's cautionary instruction, which we must presume the jury understood and followed. See United States v. Udeozor, 515 F.3d 260, 271 (4th Cir. 2008).[4] Accordingly, it was not an abuse of discretion to take judicial notice of the rules and statutes.

C.

We next consider Titus's argument that the district court violated his right to a fair trial by showing bias against his defense counsel. We review a district court's trial management under a broadly deferential standard. See, e.g., United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006) (holding that questions of trial management are "quintessentially the province of the district courts"); United States v. Godwin, 272 F.3d at

---

[4] Titus's claim that the district court's admission of the rules and statutes constructively amended the indictment fails for the same reason. See Udeozor, 515 F.3d at 271; see also United States v. Alhalabi, 443 F.3d 605, 614 (7th Cir. 2006) ("The admission of evidence . . . intricately related to the crimes charged to paint for the jury the complete picture of the scheme . . . did not alter the crimes from the ones described in the indictment.").

21

659, 679 (4th Cir. 2001) (holding that the district court has broad discretion regarding the interrogation of witnesses and has the duty to admonish counsel as part of sound trial management).

Titus claims that the district court manifested its bias against him by excessively intervening in his defense and making adverse comments toward his counsel. He cites examples of the district court acting in the absence of objection from the government in foreclosing various lines of questioning by his counsel because of concerns regarding admissibility. Citing these interventions, Titus moved for a mistrial, which the district court denied. Titus also complains of sounds emanating from the jury, which he claims were "a by-product of the cumulative interventions and comments made by the trial court toward, during, and regarding the defendant's defense." Appellant's Br. 37. Notably, Titus does not claim that the district court substantively erred in any of its sua sponte rulings.

Although a district court "must not create an appearance of partiality by continued intervention on the side of one of the parties or undermine the effective functioning of counsel through repeated interruption of the examination of witnesses," the district court "must exercise reasonable control over . . . the presentation of evidence in order to ensure the effective

22

determination of the truth [and] to avoid needless waste of time in the presentation of a case." United States v. Castner, 50 F.3d 1267, 1272 (4th Cir. 1995) (quotation marks and alterations omitted). " 'A judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune' and do not establish bias or partiality." Id. at 1274 (quoting Liteky v. United States, 510 U.S. 540, 556 (1994)).

Titus points solely to evidentiary rulings, which he does not claim were incorrect, to establish bias. But a district court is required, even in the absence of objection, to "exercise reasonable control over the mode . . . of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; [and] (2) avoid wasting time." Fed. R. Evid. 611(a). We cannot accept a suggestion that the district court erred by following the Federal Rules of Evidence. Cf. Castner, 50 F.3d at 1272 ("We find no error in [the district court questioning the relevancy of an exhibit], as the court was fulfilling its duty to ensure that the proffered exhibits were relevant before admitting them into evidence, as required by Fed. R. Evid. 402."); id. at 1272-73 (holding that it was not error for "the district court [to] attempt[] to maintain control over the presentation of evidence in order to help present a clearer set of facts to the jury, as

required by Rules 611(a) and 614(b) of the Federal Rules of Evidence"). We therefore find no error in the district court's conduct.

D.

We next consider whether the district court erred in restricting Titus's testimony to slightly more than two full days. The government's presentation of evidence spanned the first 12 days of trial. Titus took the stand in his own defense on day 13. At the end of day 13, the district court asked Titus's counsel how long direct testimony would last. Counsel replied that it would take "all day tomorrow [day 14] and maybe somewhat on Friday [day 15]." J.A. 3271. The district court then informed Titus's counsel that he would be required to finish his direct examination of Titus by the end of day 14. After some back and forth, the district court suggested that it might allow Titus to testify into day 15. Then, during a discussion on day 14 on the progress of Titus's testimony, the district court gave Titus's counsel a hard deadline to conclude Titus's testimony of 10:45 a.m. (with a start time of 9:30 a.m.) on day 15. Titus concluded his testimony at 11:00 a.m. on day 15. In total, Titus testified for just less than two-and-one-half days of trial--the exact amount of time counsel initially estimated he would need.

24

Titus argues that, in light of the amount of evidence put on by the government and the complexity of the case, "the amount of time allowed [for him] to testify was grossly inadequate . . . and it was an abuse of . . . discretion to impose such time restrictions." Appellant's Br. 46. We disagree.

As noted above, Federal Rule of Evidence 611 instructs the district court to "exercise reasonable control over the mode . . . of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; [and] (2) avoid wasting time." Fed. R. Evid. 611(a). So long as the district court gives counsel a full and fair opportunity to reach all material points, it is not an abuse of discretion to limit the length of testimony. See United States v. Midgett, 488 F.3d 288, 300 (4th Cir. 2007) (limits on testimony found not to be an abuse of discretion when, inter alia, defendant did "not contend that the limits placed on his lawyer's questioning of witnesses denied him the opportunity to elicit or attack evidence"); see also United States v. Carter, 410 F.3d 942, 951 (7th Cir. 2005) ("Simply stated, a criminal defendant does not have an absolute, unrestrainable right to spew irrelevant--and thus inadmissible--testimony from the witness stand."). Although we remain cognizant of the importance of allowing a criminal defendant to testify fully on his own behalf, Titus points to no piece of evidence that he was unable to put before

25

the jury because of the district court's minimal, at best, limit on his testimony. Accordingly, he cannot show that the limitation was an abuse of discretion.

E.

We finally consider Titus's challenges to the sufficiency of the evidence supporting his convictions. Titus claims the district court erred in denying his Rule 29 motion for acquittal. Denial of a Rule 29 motion will be affirmed on appeal if, "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). In assessing the denial of a Rule 29 motion, this court considers "circumstantial as well as direct evidence, and allow[s] the government the benefit of all reasonable inferences from the facts proven to those sought to be established." Id. "In reviewing the sufficiency of the evidence, we are not entitled to weigh the evidence or to assess the credibility of witnesses, but must assume that the jury resolved all contradictions . . . in favor of the government." United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998) (quotation marks omitted).

Titus challenges the sufficiency of the evidence put forth by the government to prove (1) specific intent to defraud for the mail and wire fraud counts, (2) the presence of a

26

conspiracy, and (3) that the money laundering transactions were conducted with mail/wire fraud proceeds. Titus's sufficiency challenge encompasses over 20 convictions but spans only five pages of his brief. With one exception--Cardwell's testimony as to her role in the conspiracy--Titus points to no specific deficiencies in the government's evidence, relying instead on conclusory statements asserting insufficiency. Accordingly, we reject Titus's sufficiency challenges in all respects.

1.

We turn first to the evidence of Titus's specific intent to defraud. "[S]pecific intent to defraud . . . 'may be inferred from the totality of the circumstances and need not be proven by direct evidence.' " Godwin, 272 F.3d at 666 (quoting United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993)).

As to specific intent, the government has clearly met its burden, and the district court was correct to deny Titus's Rule 29 motion on this issue. Titus's challenge to the sufficiency of the evidence showing specific intent to defraud consists entirely of offering another interpretation of his behavior:

> The evidence at trial, one by one, was that each lender and/or investor entered into an agreement with the defendant, and each lender and/or investor had a certain expectations [sic] of a particular result. There was rarely, if ever, a prior agreement or written instructions. Subsequently, a resulting dispute about the interpretation of an agreement, often oral, or joint venture arose. These

27

> disagreements and/or alleged breaches of contract are civil. . . .
>
> The fact that the defendant owes money to a number of people does not make his actions criminal. These people have legitimate and arguable claims that they invested money and did not get it back. There is a breach of promise, not a scheme to defraud or intent to defraud--the evidence was devoid of either.

Appellant's Br. 27-28. Even assuming that this interpretation is plausible, it does not aid Titus if the government's interpretation is also plausible. It is the province of the jury to decide among competing interpretations of the facts presented.

There is indisputably support for the government's interpretation of facts, i.e., that they demonstrate Titus had specific intent to defraud his victims. The government presented a mountain of evidence in this regard, to which Titus makes no specific challenge. For example, the government presented sufficient evidence from which the jury could conclude that Titus was attempting to conceal his actions from his clients and investors, and thus infer from this an intent to defraud. See United States v. Ellis, 326 F.3d 550, 554 (4th Cir. 2003) (holding that attempts to conceal evidence showed specific intent to defraud). A small sampling of the evidence bears this out. The jury received evidence that Titus made out a check from a client's trust account to a real estate company and noted on the check, "First Mortgage," but did not use the

28

check to buy real estate for the trust, instead depositing it in a real estate trust account and using the funds to pay firm expenses. When confronted by a colleague, Titus falsely stated that he was buying real estate for the trust. The jury also heard evidence that Titus presented a form for a client to sign that would transfer ownership of certain property from the client to Titus. Contrary to custom, Titus did not include a description of the property with the form. Titus later attached to the form a description describing property different from what Titus had led the client to believe he was transferring. The government also introduced copious amounts of evidence that Titus engaged in "lulling" activity, which also evidences a specific intent to defraud. See United States v. Kelley, 551 F.3d 171, 172 (2d Cir. 2009). These examples alone are sufficient to support a jury finding of specific intent to defraud.

2.

Titus also challenges the sufficiency of the evidence presented by the government to prove that Titus engaged in a conspiracy with Cardwell to commit mail and wire fraud. Titus claims that the evidence only supported a conspiracy between Cardwell and Titus to "ma[ke] certain representations in certain documents/loan applications," but not to commit mail or wire

29

fraud. Appellant's Br. 28. This is a distinction without a difference.

To prove a conspiracy, the government need not prove that each coconspirator engaged in each act of the enterprise. On the contrary, it is well settled that a particular coconspirator "need not be involved in every phase of [the] conspiracy to be deemed a participant" in a single, ongoing conspiracy. United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988). To prove a conspiracy, the government need only show an overlap of key actors, methods, and goals, indicating one overall agreement or one general business venture. See, e.g., United States v. Smith, 451 F.3d 209, 218 (4th Cir. 2006); United States v. Pratt, 351 F.3d 131, 140 (4th Cir. 2003).

Here, the jury could reasonably conclude that Titus and Cardwell were working together in one general business venture that depended on mail and wire fraud for its success. Cardwell testified that she helped Titus conduct straw purchases of property to obtain money from mortgage lenders. These funds were then used, in part, to make lulling payments to his other victims. Evidence also showed that Cardwell assisted Titus in defrauding Mary Honning by use of the wires. This evidence is sufficient for a reasonable jury to conclude that Titus and Cardwell had agreed to participate in a scheme to defraud furthered by the use of the mail and wires.

30

3.

Titus's final sufficiency challenge involves his convictions for money laundering. This challenge, however, relies completely on the earlier challenge to sufficiency of the evidence demonstrating Titus's specific intent to defraud in the mail and wire fraud counts. Because that earlier challenge failed, this challenge must necessarily also fail.

III.

For the foregoing reasons, we affirm the district court in all respects.

AFFIRMED